

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FORM FOR USE IN APPLICATIONS FOR HABEAS CORPUS UNDER 28 U.S.C. § 2254

(eff. 12/1/04)

*John Griffin*
_____  PETITIONER
(Full Name)   (Include name under which you were convicted)

**06 -3953**

vs.          Case No _____
(Supplied by the Court)

*David Digugliclmo*
_____  RESPONDENT
(Name of Warden, Superintendent, Jailor, or authorized person having custody of petitioner)
                    and
THE DISTRICT ATTORNEY OF THE COUNTY OF *Philadelphia*
                    and
THE ATTORNEY GENERAL OF THE STATE OF *Pennsylvania*
                    ADDITIONAL RESPONDENT

*AM8535*
_____
Name                              Prison Number

*SCI-Graterford*          *Graterford, Pa.*
Place of Confinement

(If petitioner is attacking a judgment which imposed a sentence to be served in the future, petitioner must fill in the name of the state where the judgment was entered. If petitioner has a sentence to be served in the future under a federal judgment which he wishes to attack, he should file a motion under 28 U.S.C. § 2255, in the federal court which entered the judgment.)

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

INSTRUCTIONS-READ CAREFULLY

1. You must include all potential claims and supporting facts for which you might desire to seek review because a second or successive habeas corpus petition cannot be filed except under very specific and rare circumstances requiring certification by the Third Circuit Court of Appeals as set forth in instruction # 13.

2. Your habeas corpus petition must be filed within the 1-year statute of limitations time limit set forth in 28 U.S.C. §2244(d)(1). (There are limited circumstances in which the petition may be amended, within the one-year time period, to add additional claims or facts, see Federal Rules of

1

Civil Procedure 15; or amended after the one-year period expires, in order to clarify or amplify claims which were timely presented,  see United States v. Thomas, 221 F. 3d 430 (3d Cir.2000.)

3. Any false statement of a material fact in your petition, in a motion for leave to proceed in forma pauperis, or in any other motion you file in this case may serve as the basis for prosecution and conviction for perjury.

4. This petition must be typewritten, printed, or legibly handwritten and signed by you as the petitioner or by your representative on Page 11. You should answer all questions concisely in the proper space of the petition. If you need more room to answer any question, you may write on the reverse blank sides of the petition.

5. You may not attach additional pages to the petition. You do not have to list or cite the cases or law that you are relying on. If you do want to cite the cases and law you are relying on and make legal arguments, you should do so in a separate concise brief or memorandum which should be filed along with the petition.

6. When you file your petition, you must include a filing fee of $5.00. If you cannot pay the full filing fee, you must request permission to proceed in forma pauperis as explained in instruction # 8.

7. Your petition will be filed if you have followed these instructions and it is in proper order.

8. To request permission to proceed in forma pauperis without paying the full filing fee, you must completely fill out pages 12 through 18 of the petition. You should answer all questions and sign where indicated on Pages 12 and 18. You should see to it that an authorized prison official completes the certification on Page 19. You must prove that you cannot pay the full filing fee and other costs because of poverty and a discharge in bankruptcy will not excuse you from this requirement. The Court will let you know if you may proceed in forma pauperis.

9. Only final judgments entered by one state court may be challenged in a single petition. If you seek to challenge judgments entered by different courts either in the same state or in different states, you must file separate petitions as to each court.

10. As required by 28 U.S.C. § 2254(b)(1), you must have exhausted all claims that you are making in your petition. This means that every claim must have been presented to each level of the state courts. If you file a petition that contains claims that are not exhausted, the federal court will dismiss your petition. 28 U.S.C. § 2254(b)(2) provides that if it is perfectly clear that no colorable claims are presented, the federal court can also deny your petition on the merits.

11. As required by 28 U.S.C. § 2254(e)(1), a federal court, when considering your habeas corpus petition, must deem as correct a determination of fact made by a state court unless you rebut the presumption of correctness by clear and convincing evidence. Under 28 U.S.C. § 2254(e)(2), if

2

you have failed to develop the factual basis of a claim in state court proceedings, a federal court cannot hold an evidentiary hearing on that claim unless you show that:

> (i) the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the U.S. Supreme Court, that was previously unavailable,
> or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence.
> You must also show that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found you guilty of the offense in question.

12. As required by 28 U.S.C. § 2244(b)(1), a federal court must dismiss any claim in a second or successive habeas corpus petition that *was* presented in a prior habeas corpus petition.

13. As required by 28 U.S.C. § 2244(b)(2), a federal court must dismiss any claim in a second or successive habeas corpus petition that *was not* presented in a prior habeas corpus petition unless you show:

> (A) the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the U.S. Supreme Court, that was previously unavailable;
> or
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence, and (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found you guilty of the offense in question.
> Before such a second or successive petition may be filed in the district court, however, the petitioner must move the court of appeals for an Order authorizing the district court to consider the petition. Petitioner's motion for such an Order must be determined by a three judge panel of the court of appeals, which must grant or deny the motion within 30 days. The court of appeals may grant the motion only if it determines that the petition makes a prima facie showing that it satisfies either (A) or (B) above.

14. 28 U.S.C. § 2254(i) provides that ineffectiveness of counsel during post-conviction, habeas corpus and P.C.R.A. proceedings in state or federal court may not be grounds for relief in your petition.

15. When the petition is fully completed, the **original and four copies** must be mailed to the **Clerk of the United States District Court, Room 2609, 601 Market Street, Philadelphia, PA 19106.** You must return all pages, including these instructions

## PETITION

1. (a)   Name and location of court which entered the judgment of conviction under attack: *Court of Common Pleas, Phila. Pa*

   (b)   Name of Prosecutor: *Clifford Haines*

   (c)   Prosecution conducted by District Attorney's Office of *Phila.* County

2. (a)   Date of Judgment of conviction: *8/20/75*

   (b)   Indictment number or numbers: *1431-1432*

   Term: *January 1975*   Criminal Case Number: *1431-1432*

3. Length of sentence: *Life*   Sentencing Judge: *Jacob Kalish*

4. Nature of offense or offenses for which you were convicted: *Murder*

   _____

   _____

5. What was your plea?  (Check one)
   (a) Not guilty (✓)   (b) Guilty ( )   (c) Nolo contendere ( )

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:_____

   _____

   _____

6. **If you pleaded not guilty**, what kind of trial? (Check one)   (a) Jury ( )   (b) **Judge only ( )**

7. Did you testify at the trial?   Yes ( )   No (✓)

8. Did you appeal from the judgment of conviction?   Yes (✓)   No ( )

9. If you did appeal, answer the following

(a) Name of court: *Pa. Superior Court*

(b) Result: *Judgment Affirmed*

(c) Date of result and citation, if known: *10/19/79*    *Com v. Griffin 271 Pa. Supre 228*

(d) Grounds raised: *Prosecutorial misconduct, erroneous identification State should not have been allowed to reopen case.*

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following: 
   (1) Name of court: *Pa. Supreme Court*

   (2) Result: *Petition for Allowance of Appeal denied*

   (3) Date of result and citation, if known: *4/1/80*

   (4) Grounds raised: *Same as Above*

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

   (1) Name of court: *U.S. District Court, Phila. Pa.*

   (2) Result: *Denied*

   (3) Date of result and citation, if known: *12/12/84* *(C.A. No. 84-1843)*

   (4) Grounds raised: *Prosecutorial misconduct, erroneous identification*

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?   Yes (✓)  No ( )

11. If your answer to 10 was "yes," give the following information:

   (a) (1) Name of Court: *Court of Common Pleas, Phila. Pa.*

   (2) Nature of proceeding: *Post Conviction Relief Act*

(3) Grounds raised: *Failure of prosecutor to disclose deal given to his witness; Ineffectiveness of counsel, exclusion of defense witness testimony impeaching State's witness.*

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes (✓)  No ( )

(5) Result: *Relief denied*

(6) Date of result: *4/3/91*

   (7) Did you appeal the result to a higher court?   Yes (✓) No ( )   *(93-cv-4862*

Court Name(s) *Pa. Superior Court - U.S. District Court*

Result(s) *Judgment Affirmed - dismissed* *abuse of the writ*

Result Date(s) *3/31/92 — 3/28/94*

(b) As to any second petition, application or motion give the same information:

   (1) Name of Court: *Pa. Court of Common Pleas*

   (2) Nature of proceeding: *Post Conviction Relief Act*

   (3) Grounds raised: *Accomplice Liability*

   (4) Did you receive an evidentiary hearing on your petition, application or motion?
   Yes ( )  No (✓)

   (5) Result: *Dismissed*

6

(6)  Date of result: _12/9/1997_

(7) Did you appeal the result to a higher court?      Yes ( )  No ( )

Court Name(s) _Pa. Superior Court_

Result(s) _Affirmed_

Result Date(s) _6/21/1999_

(c) As to any <u>third petition</u>, application or motion give the same information:

(1) Name of Court: _Pa. Court Common Pleas_

(2) Nature of proceeding: _Post Conviction Relief Act_

(3) Grounds raised: _Governmental interference - Newly discovered evidence - Abuse of discretion ineffectiveness of counsel (presently raised issues)_

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ( )  No (✓)

(5) Result _Dismissed as being untimely filed_

(6)  Date of result: _10/26/2004_

(7) Did you appeal the result to a higher court?      Yes (✓)  No ( )

Court Name(s) _Pa. Superior + Supreme Courts_

Result(s) _Affirmed - Pet. for Allowance of Appeal denied_

Result Date(s) _(10/26/2005 Superior court)(1/31/2006 Supreme court)_

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

12. State *concisely* every ground on which you claim that you are being held unlawfully. Give specific facts supporting each ground.

*CAUTION*: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies, you should set them forth in this petition if you wish to seek federal relief. If you fail to set forth all such grounds in this petition, you may be barred from presenting them at a later date.

For information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted all your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure, (where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim).

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest, (where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim).

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

8

A. Ground one: *PLEASE SEE ATTACHED MEMORANDUM of LAW - [governmental interfarence - Newly discovered*

Supporting FACTS (state *briefly* without citing cases or law):

*evidence] MEMORANDUM page ①*

B. Ground two: *PLEASE SEE ATTACHED MEMORANDUM of LAW - [Abuse of discretion]*

Supporting FACTS (state *briefly* without citing cases or law):

*MEMORANDUM page ⑭*

C. Ground three: *PLEASE SEE MEMORANDUM of LAW - INEFFECTIVE Assistance of counsel*

Supporting FACTS (state *briefly* without citing cases or law):

*MEMORANDUM page ⑯*

D. Ground four: _____

Supporting FACTS (state *briefly* without citing cases or law).

_____

9

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

*All grounds were raised in state court.*

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?      Yes ( )  No (✓)

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing: *Richard Johnson Phila. Pa.*

(b) At arraignment and plea: *Richard Johnson S/e.*

(c) At trial: *Harold Randolph, Phila Pa*

(d) At sentencing: *Lewis Lipschitz (deceased)*

(e) On appeal: *Gerald Stein, Phila. Pa.*

(f) In any post-conviction proceeding: *Norris Gelman*

10

_625 Walnut St. Phila. Pa._

(g)  On appeal from any adverse ruling in a post-conviction proceeding : _____

_Norris Gelman, sla_

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?     Yes ( )  No (✓)

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?     Yes ( )  No (✓)

(a)  If so, give name and location of court which imposed sentence to be served in the future:

_____

_____

(b)  And give date and length of sentence to be served in the future: _____

_____

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?    Yes ( )  No ( )

I declare under penalty of perjury that the foregoing is true and correct

Executed on _August 19, 2006_ _____
     Date                                    Petitioner's Signature or
                                  Signature of Petitioner's Representative


Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

11

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN W. GRIFFIN                  :
     Petitioner,              :
                    :
                    :
     V.                       :
                    :
                    :
DAVID DIGUGLIIELMO               :
     Superintendent, et al.,  :

MEMORANDUM IN SUPPORT OF PETITION FOR
WRIT OF HABEAS CORPUS UNDER 28 U.S.C. §2254

John Griffin AM-8535
Petitioner - Pro se
P.O. Box 246
Graterford, Pa 19426

I.   Introduction:

         Newly Discovered Evidence.........................1

         Abuse Of Discretion..............................14

         Ineffective Assistance Of Counsel Or
         A Lack Of Due Process And Equal Protection.......16

II.  Relevant Procedure History...........................18

III. Statement øf Facts...................................20

IV.  Argument.............................................36

         A. Governmental Interference And Newly Discovered
            Evidence Claim Could Not Have Been Discovered
            Previously Through Due Diligence.................39

         B. Newly Discovered Facts If Proven And In Light
            Of Evidence As A Whole Are Sufficient To
            Establish By Clear And Convincing Evidence But
            For Constitutional Error No Reasonable Juror
            Would Find Applicant Guilty.....................50

         C. Abuse Of Discretion Shown By A 1999 Ruling
            From The !989 PCRA Court Should Be Reviewed
            By Federal Court And Determined As Being A
            Non-Successive Issue That Did Not Exist When
            Applicant Filed His First Habeas Corpus.........55

         D. Applicant's 1989 PCRA Attorney's Failure To
            Appeal The Abuse Of Discretion Issue Was
            An Act Of Ineffectiveness Or A Lack Of Due
            Process And Equal Protection From The Courts.....63

V.   Conclusion...........................................66

Exhibits:

A: Hunter's criminal extract presented at trial

B: Letter from PCRA Attorney concerning Hunter's criminal
   extract he received/Attorney's letter to paralegal about
   trying to obtain Hunter's criminal record

C: Hunter's sentencing notes

D: Attorney Rosen's affidavit stating his testimony about
   Hunter's deal had been misstated by Judge McCrudden/PCRA
   transcript/Judge McCrudden's misstated written opinion

E: Letter from Attorney Gelman to petitioner stating that
   Judge McCrudden would invent an excuse to deny/Letter
   from petitioner to Attorney Gelman asking that he appeal
   Judge McCrudden's misstatements of supportive testimony

F: Supplemental brief filed by petitioner in an attempt to appeal Judge McCrudden's misstatements of testimony

G: Investigator Walter P.Lee's letter stating he could find no files on Hunter

H: Investigator Alercia's letter explaining the difficulties he was having locating information

I: Investigator Tiscornia's affidavit explaining how Hunter's undisclosed criminal record was located

J: Paralegal Greco-Morgan's affidavit concerning her meeting with Judge Halbert and how Hunter's undisclosed criminal record was located

K: The first three undisclosed criminal convictions of Hunter's to be located

L: The next three undisclosed criminal convictions of Hunter's to be located

M: Affidavit(s) showing that attempts were made in 1983-4 to obtain files on Hunter before petitioner/movant's first habeas corpus filing

N: 4/13/2005 Opinion from the PCRA Court

O: 10/26/2005 Order from the Superior Court affirming the lower court

P: 1/4/2006 Order denying reconsideration

Q: 7/19/2006 Order from the Supreme Court denying allocatur

R: The federal docket

## I.    INTRODUCTION

Pursuant to 28 U.S.C §2254, petitioner, John W. Griffin, [herein "petitioner"] as a pro se litigant, respectfully request this United States District Court for the Eastern District of Pennsylvania to accept the filing of petitioner's claims, which includes "newly discovered" evidence, (ground one), that could not have been raised in petitioner's first federal habeas corpus petition, and the claim of "abuse of discretion", (ground two), an issue that did not exist at the time of petitioner's first filings because it was the result of a 1991 PCRA Court ruling based upon purposely "misquoted" and "invented" testimony that appears nowhere in record.

If this petition is now before this Honorable Court, it is the result of the findings by the United States Court of Appeals for the Third Circuit. As this petitioner asked that Court to consider whether applying the procedural aspects of gate-keeping provision of the Antiterrorist and Effective Death Penalty Act of 1996 (AEDPA) would have an impermissible retroactive effect if applied in this case. When petitioner filed his first federal habeas corpus petition, the existing law provided that he could thereafter prosecute another such petition only if he could (1) show cause for, and prejudice from, the omission of a new claim or claims from his earlier petition (i.e., that his proceeding would not constitute an "abuse of the writ"), or (2) demonstrate actual innocence." See 28 U.S.C. §2244; McCleskey v. Zant, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); Kuhlmann v. Wilson, 477 U.S. 436, 106 S.Ct. 2616.

Though petitioner feels his newly discovered evidence claim meet the requirements under 28 U.S.C. §2244, (the post-AEDPA standard), he also states that in cases like his, where a prisoner in state custody had a right to prosecute a second or successive petition prior to AEDPA's passage, but might be deprived of that right by these new gate-keeping provisions, this court should concluded that applying the AEDPA standard would have a "genuine retroactive effect" because it would attach a new and adverse consequence to pre-AEDPA conduct: -- prosecution of the original proceeding. See In Re: Minarik, 166 F.3d 591 (3rd Cir. 1999).

In this case, petitioner's first habeas corpus petition was filed in 1984, and denied on the merits in 1984. However, the due process claim now raised in this habeas petition, (ground one), arises out of "newly discovered" evidence that had been purposely suppressed by the state's prosecutor, in violation of Brady v. Maryland, 373 U.S.83, 87, 83 S.Ct 1194, 10 L.Ed.2d 215 (1963), and despite the exercise of due diligence, the factual predicate for this claim could not have been discovered prior to July 2003, when the retired sentencing judge of the Commonwealth's sole witness finally admitted that he had possibly had files on this witness and directed investigators to where they might now find them.[1]

Though files on this witness had previously been requested at different times by petitioner, by separate attorneys, and by separate investigators, no additional files were found.

_____

[1] When this same judge (Judge Halbert) was contacted in 1992 by petitioner's then appeals attorney, Jules Epstein, as part of researching Hunter in preparation for filing a habeas petition, Judge Halbert stated he had no files on Hunter.

However, the newly discovered evidence found recently, consisted of six (6) undisclosed criminal convictions, three (3) found where the witness's sentencing judge said they might now be, (Prothonotary's Office), and three (3) found by issuing a subpoena at the County Parole Department.[2]

Because petitioner's trial attorney had relied on the prosecutor's statement at a March 10, 1975 discovery hearing, as well as at trial, that all exculpatory evidence (including the complete criminal record of his witness) would be, and had been, disclosed. And despite the arduous efforts of petitioner's trial attorney: despite efforts made in 1983-4 by petitioner: despite efforts of his 1989 PCRA attorney: the effort of his 1992 attorney: and four separate investigators, to search and locate any files containing evidence that might prove petitioner's innocence or a lack of due process, the suppressed portion of this witness's criminal record remained secreted from petitioner until July 11, 2003. Therefore, the newly discovered evidence petitioner raises in this present habeas corpus petition could not have been discovered previously through the exercise of due diligence.

The prosecutor, in this case, had an obligation to turn over to the defense, their witness's entire criminal record, as ordered by the court during the March 10, 1975 discovery hearing. This cannot be considered harmless error where the criminal record is exculpatory and material for purposes of impeachment, and where facts, had they been disclosed to the jury, could have resulted in a different verdict.

---

[2]
    With the exception of 1985, when petitioner located the witness's sentencing notes which showed this witness received an undisclosed deal, other attempts to locate files failed.

Nor should the obligation of diligence required of the prosecutor to produce the complete criminal record of their witness at trial, be placed upon the meager shoulders of the petitioner when it is the state who has the proper resources to adequately produce their witness's criminal background.

At petitioner's trial in 1975, the jury was presented with a criminal extract that indicated that Commonwealth witness, Calvin Hunter, herein (Hunter), had but one prior burglary conviction in which he had served a 1-to-3 year sentence for. But had the Commonwealth disclosed Hunter's complete criminal record, the jury would have learned that Hunter was a career criminal who had also served a separate 1-to-3 year sentence for another burglary; and had also recently served time for robbery and other crimen falsi offenses, i.e., burglary, larceny, forgery, passing worthless checks, and receiving stolen goods.

Had the jury heard of Hunter's other convictions, they might have been less believing of the prosecutor's argument that Hunter had received his lenient sentence of <u>time served</u>, (2½ <u>months</u>) <u>to</u> <u>twenty-three</u> <u>months</u> <u>non-reporting</u> <u>probation</u> for his presence two burglaries, larcenies, and receiving stolen goods, because he had thrown himself on the mercy of the court and admitted his guilt.

Had the jury known of Hunter's prolific criminal career, they might have been less believing of the prosecutor's claim that Hunter had nothing to gain by lying, and the jury might have questioned why Hunter, who was still on parole from his previous convictions, and whose newly discovered documents show, had used numerous aliases with a myriad of addresses,

had received far less time for his most recent convictions than he had received for his prior convictions.

Though neither petitioner nor his attorney were aware of any undisclosed criminal convictions, **due diligence** was shown when the defense requested, at the 3/10/1975 discovery hearing, all exculpatory evidence and Hunter's criminal record: **due diligence** was shown by petitioner's trial counsel attempting to verify Hunter's criminal record, by calling to the witness-stand, Assistant District Attorney (ADA) Michael Henry, who represented the state at Hunter's sentencing, and Ruth Goldberg, the Clerk of Quarter Sessions and Custodian of Records: **due diligence** was shown in 1983-84 by petitioner trying to locate files on Hunter from the Clerk of Records: **due diligence** was shown when petitioner did locate Hunter's sentencing notes showing he had received an undisclosed deal: **due diligence** was shown when petitioner's PCRA counsel requested Hunter's criminal record, but received the same uncomplete extract that had been given to trial counsel 14 years earlier: **due diligence** was shown when petitioner's 1992 appeal attortney make a request to Hunter's sentencing judge (Judge Halbert) for any files he might have concerning Hunter's deal, only to be told that his records indicated he had no files on Hunter: and petitioner showed **due diligence** throughout by hiring at least three separate investigators to search for any and all court files on this witness.

With the exception of locating Hunter's sentencing note in 1985, none of the above efforts uncovered the concealment by the prosecutor until July 2003, after two investigators, volunteering their time, again spoke with Judge Halbert about

Hunter's sentencing, and requested any information he might have concerning the deal Hunter's two previous attorneys had testified that he received.[3]

It was because of Judge Halbert's revelation that any files he may have had would **now** be at the Prothonotary's Office, that the investigators **again** searched for files there and inadvertently found additional criminal records amongst papers containing information about Hunter's sentencing and papers concerning one of petitioner's co-defendant's trial.

Because the facts making up petitioner's newly discovered evidence claim were not discoverable until July 11, 2003, and could not have been raised in petitioner's first habeas corpus petition, **there is no inexcusable neglect or abuse of the writ situation where this first claim is concerned.** In McCleskey v. Zant, supra, at 499 U.S. 469, the Court clearly explained that "an abuse of the writ situation is one where petitioner could have raised the claim before in the prior federal habeas petition and received a decision on the merits but did not do so."

In In Re: Minarik, supra, the legal analysis expressed in McCleskey, convey a thorough review of abuse of the writ. The legal standard announced is that a petitioner can excuse his failure to raise a claim in an earlier petition and thereby disprove abuse of the writ by either two means: a

---

[3]
   At petitioner's 1989 PCRA evidentiary hearing, Hunter's two prior attorneys testified that Hunter had received a deal to testify against petitioner. However, the PCRA Court Judge misrepresented and misquoted both attorneys testimony in his order and opinion, and used that misrepresentation to deny petitioner's 1989 Brady claim. See (Attorney Rosen's 2004 Affidavit - attached as exhibit d).

showing of "cause" for failing to raise the claim in the earlier proceeding, and "prejudice" therefrom; or by showing that a fundamental "miscarriage of justice" would result from a failure to entertain the claim.

Petitioner states that a "miscarriage of justice" occurred in his case, and he meets the "cause and prejudice" standard.

Secondly, petitioner states that his application for state post conviction was properly and timely filed and that his claim of newly discovered evidence met two requirements that are enumerated in Pennsylvania's statutory exceptions, under 42 Pa.C.S.A. §9545(b)(1)(i-iii)&(2).

Exceptions met under 42 Pa.C.S.A. §9545(b)(1)(i-iii) are:

(i)   the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii)  the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence.

**

Petitioner avers that, this Honorable Court has authority to review petitioner claims based on merits and grant him a new trial. Or in the alternative, petitioner request this Court grant him an evidentiary hearing.

Where, as here, a petitioner who seeks an evidentiary hearing in federal court, the court must decide whether or not petitioner has failed to develop the factual basis of a claim in State court. See 28 U.S.C. §2254(e)(2). If he has failed, the court must deny a hearing, unless, he establishes that one of the two exceptions set forth in §2254(e)(2) applies.

Petitioner avers that he meets the following exceptions:

  (A) the claim relies on –

    (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

  (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonableb factfinder would have found the applicant guilty of the underlying offense.

Petitioner diligently sought an evidentiary hearing in state court, and his request was denied. But had he not been prevented from developing a factual basis for his claim in state court, the record would show:

1) that the Commonwealth failed to disclosed a substantial portion of their **only** witness's criminal record. Convictions, all of which were crimes (of crimen falsi) material to the case because this was the only witness against petitioner.

And,

2) a hearing would have established on the record that, (as stated above), though petitioner was unaware of the undisclosed part of Hunter's criminal record, due diligence was shown over the years, (from the discovery hearing: trial attorney's efforts: petitioner's efforts: the PCRA attorney's efforts: the appeal attorney efforts: and the continuing efforts of petitioner) to locate files and evidence relating to this witness which might have proved that petitioner was innocent and had received far less than a fair trial.

Accordingly, in regard to the state court's determination of factual issues, this Honorable Court should not apply the presumption of correctness, where, 1) there is a substantial allegation of newly discovered evidence; 2) the merits of the

8

factual dispute were not resolved in a state hearing; 3) the state factual determination is not fairly supported by the evidence presented; 4) no factfinding procedure was employed by the court; 5) the material facts were not adequately developed; and, 6) the factual allegations are materially in dispute and the legal issue were not developed due to the denial by the state court to grant an evidentiary hearing.

Whereas this petitioner alleges facts that challenges this presumption, the written opinion of the state court should not be presumed to be correct under 28 U.S.C. §2254.

Based on the argument provided here, this Honorable Court should grant petitioner the relief of a new trial or in the alternative, an evidentiary hearing so that the facts of the Brady violation, which resulted in a due process violation, can be clearly established.

At issue, is whether petitioner's discovery, (26 years after his trial) of evidence that had been withheld from the defense by the prosecutor, could have possibly been included in petitioner's first habeas corpus filing in 1984. The Court should conclude that the answer is no, and petitioner should not be penalized by being denied the opportunity of raising this Constitutional violation in this present habeas petition because of the erroneous actions of the Commonwealth.

After petitioner was returned from the federal system, (where he had been confined for the first eight years of his incarceration, the last 3 of the 8 in complete lockdown), to the state system in Pennsylvania. He immediately contacted the Clerk of Records at City Hall and sought any files that might be used to expose the state's sole witness as a liar

9

who had received a deal for testifying against petitioner. However, the Clerk of Records responded there were no files on Hunter because he was dead and his files had probably been destroyed. Petitioner then, in 1984, filed his first habeas corpus petition, which this Court first rejected as a mixed petition. Petitioner then dropped those issues that had not been litigated in state court and returned to federal court with his first habeas petition. After being denied by this Court in 1984, petitioner learned from a friend, who knew the lawyers that had represented Hunter, (the state's witness), that the rumors of Hunter being given a deal were true. Armed with this information, (an affidavit from Hunter's attorney and Hunter's sentencing notes), petitioner filed his first PCRA petition. In 1993, when petitioner subsequently raised, in District Court, the issues of ineffective assistant of counsel and the undisclosed deal that was given to Hunter, this Court dismissed petitioner's second habeas petition as an abuse of the writ.

Throughout this investigation and search for records on Hunter, no one but the Commonwealth knew that the prosecutor had concealed and secreted information concerning Hunter's past criminal history. When files were sought, petitioner was always told that none existed.

Both the Federal and Pennsylvania Courts have held: "the only exception to the requirement of reasonable diligence in seeking evidence during trial  is the situation where the Commonwealth knowingly misleads the defendant." So, when the prosecutor at petitioner's trial in 1975, maintained that the two page criminal extract represented the complete criminal

10

record of Calvin Hunter, he purposely misled the defense into thinking that they had the complete criminal record of the Commonwealth's only witness. And, because petitioner nor his attorneys knew of the additional criminal files, when further inquiries concerning other files were made, petitioner had no reason to doubt those who responded that no files existed.

Petitioner avers that his demonstration of due diligence, as well as, that of his pre-trial attorney, his trial lawyer, his PCRA counsel, and that of his investigators was thwarted by the Commonwealth and establishes "cause" for not including this issue in petitioner's first habeas corpus petition.

Petitioner also avers that the state's failure to provide his trial attorney with Hunter's complete criminal history prejudice petitioner by impeding a valuable process by which he could have impeached the Commonwealth's only witness.

The evidence presented against petitioner at his trial was circumstantial, and came almost entirely from Hunter.[4] Had the Commonwealth made available Hunter's complete criminal record at that time, petitioner's attorney could have refuted the prosecutor's comments that Hunter had no reason to lie, and that Hunter's lenient sentence for his recent two burglaries and related charges was based on him throwing himself on the mercy of the court and admitting his guilt. So, indeed, the

---

[4]
    Hunter's testimony was that he saw petitioner and two other inmates "escorting" Price down the corridor and then hearing screams before witnessing petitioner and the two other inmates come back pass his cell. However, Hunter made two statements, the first, handwritten statement made on the day of the murder, made no mention of seeing petitioner or anyone before he heard the screams. In fact, when asked if he saw anyone, he said "no". It was in his second statement, made on the day he plead guilty to his open cases, that he mentioned seeing the victim being escorted by petitioner.

suppression of this witness complete criminal record by the prosecutor severely prejudiced petitioner.

Petitioner's demonstration of "cause" and "prejudice" is not unlike those presented to the United States Supreme Court via Banks v. Dretke, 121 S.Ct. 1256 (2004), and in Strickler v. Green, 119 S.Ct. 1936 (1999); presented in petitioner's legal argument session contained within this petition.

THe circumstances, (the presentation of newly discovered evidence), surrounding this case demonstrates not only the lack of due process in petitioner's case, but also clearly conveys to this Honorable Court that a miscarriage of justice was committed. Comparable to a recent case, United States v. Jeffrey MacDonald, No. 05-548, to go before the United States Court of Appeals for the Fourth Circuit, where the Circuit Court granted authorization. As in the MacDonald case, this petitioner's trial also occurred in the 1970s, and there were a number of intervening years before new evidence was able to be discovered. However, unlike the MacDonald case from the Fourth Circuit, this petitioner had absolutely no knowledge of the kind of evidence that was withheld at trial. Based on earlier events in his case, MacDonald had reason to suspect that a statement by that particular witness existed. In this petitioner's case, however, the prosecutor presented to the defense only a partial criminal record and maintained that it represented the entire criminal history of their witness; thus, a showing of "cause" is stronger in petitioner's case than in the MacDonald case because petitioner's counsel and all subsequent counsel for the defense, had no reason to suspect there were additional convictions being withheld. And

12

petitioner presents a stronger showing of "prejudice" because unlike in the MacDonald case, there is no other evidence that connects petitioner to this crime. Had the "newly discovered" evidence been made available at trial, petitioner's counsel would have proven not only that Hunter had reason to lie, but that Hunter also had a propensity for lying, shown by the many aliases and different addresses contained within the newly discovered criminal records. Under those circumstances, there would have been a verdict finding this petitioner not guilty of the crime for which he was charged.

For the United States Court of Appeals for the Fourth Circuit and the United States District Court for the Eastern District of North Carolina to combine and grant a hearing in United States v. Jeffrey MacDonald, supra, and Third Circuit and District Court for the Eastern District of Pennsylvania not to grant this petitioner a hearing, under very similar circumstances, would clearly demonstrate a basic bias toward this petitioner, whether it be that he is a pro se litigant or otherwise, and amounts to a miscarriage of justice where petitioner has shown that the Commonwealth of Pennsylvania continuously violated his right to due process under the 5th, 6th, and 14th amendments of the United States Constitution.

This newly discovered evidence, (criminal record), is just the latest in a series of constitutional violations committed by the state. Thus, as outline herein, petitioner's claim of newly discovered evidence should cause this Court to conclude this is not an abuse of the writ and petitioner satisfies the requirements to be heard by this Honorable Court.

13

PETITIONER'S SECOND CLAIM
ABUSE OF DISCRETION

Petitioner's second claim, abuse of discretion, resulting from the 1991 ruling of the PCRA Court Judge, is one that could not have been raised in petitioner's first federal habeas corpus petition, filed in 1984, because the abuse of discretion had not occurred at that time. See In Re: Cabey, 429 F.3d 93 (4th Cir. 2005); In Re: Cain, 137 F.3d 234 (5th Cir. 1998). As a result, petitioner avers that this Court should view this issue as one not brought in a second or successive petition, within the meaning of the AEDPA, simply because it follows an earlier federal petition. A later petition is "successive" only when it: "1) raises claims challenging petitioner's conviction or sentence that was or could have been raised in earlier petition; or 2) otherwise constitutes abuse of the writ. 28 U.S.C.§2244(b).

Petitioner states that the 1989 PCRA Court deprived him of a fair and impartial adjudication of the pleading at issue by misrepresenting, misstating, and modifying the testimony of two witnesses, (both attorneys), who testified that their client, Hunter, had received a deal from the Commonwealth in exchange for his testimony against petitioner. The PCRA Court used its own misstatements of credible testimony in its Order and Opinion to deny petitioner's claim. Petitioner's counsel failed to preserve this error on appeal, which was either an ineffectiveness of counsel or a lack of due process and equal protection from the Appellate Court.

**The facts underlying this issue:** On January 25, 1989, petitioner appeared before Judge James D. McCrudden at a PCRA

14

evidentiary hearing concerning the issues advanced in his PCRA petition. In support of his pleadings, that the sole witness for the prosecution, (Calvin Hunter), received an undisclosed deal  from the prosecutor in exchange for his testimony against petitioner. Two witnesses, Attorneys, John Scott and David Rosen, from the Philadelphia Public Defenders Association, who had represented Hunter in his open cases, testified that a deal was given to their client, and benefits were conferred upon him, all in exchange for his testimony against petitioner.[5] **[See Exhibit D - Attorney Rosen's 2004 Affidavit stating that his testimony was misstated by the PCRA Judge from what he testified to at the 1989 hearing].**

Though both attorneys testified that Hunter had received a deal and had benefits conferred upon him in exchange for his testimony against petitioner. Judge McCrudden, who was the presiding judge, and who had asked most the questions of these attorneys, misstated the answers these witnesses gave in response to his questions. And in his 1991 final Order and Opinion, Judge McCrudden used these misstatements of crucial testimony to deny petitioner's claims.

Though petitioner's PCRA attorney had earlier written to petitioner expressing the fact that this particular judge would go so far as to **"invent some reason to deny relief"**, petitioner's attorney failed to raise this issue on appeal, even though petitioner had written to him asking that the

---

[5]

Because Hunter died of a self-induced drug overdose prior to petitioner's trial, he was not available to testify at the 1989 PCRA hearing. To review Attorney Rosen's testimony, see (PCRA N.T. pp. 18, 23, 26, 32, 35, 48, 55 - Attorney Scott's at: PCRA N.T. pp. 65, 67-8, 72, 74-5, 85, 87, 90, 95

issue be raised. [See Exhibit E: 10/25/88 letter from lawyer stating that judge would invent some reason to deny relief- and a 4/17/91 letter to the lawyer from petitioner, asking that he raised this issue on appeal] and [Exhibit F: where petitioner filed a supplemental brief, attempting to raise this issue himself].

PETITIONER'S THIRD CLIAM
INEFFECTIVE ASSISTANCE OF COUNSEL OR A LACK
OF DUE PROCESS AND EQUAL PROTECTION

The fact that petitioner's PCRA attorney had no logical reason for not raising the issue of abuse of discretion by the PCRA Judge, (especially since he had predicted it), shows that petitioner was denied effective assistance of counsel, due process, an equal protection of the law.

Witnesses called by petitioner's attorney testified there was a deal in this case. When the judge asked Attorney Rosen if there was a deal in this case, Rosen answered, "Yes, there was a deal that does not appear on the record." (1989 PCRA N.T. pp. 48, 49). But when Judge McCrudden described this testimony in his 1991 written Order and Opinion, he stated that Rosen had said he knew nothing of a deal. The judge's 1991 Opinion is replete with these kind of mis-statements, yet petitioner's attorney failed to raise them on appeal, and the court has continuously resisted petitioner's attempts to have this issue finally litigated. This is an issue where a State Judge clearly misstated testimony from two witnesses that supported petitioner's claim of an undisclosed deal being given to their client. What is perplexing to this petitioner is how no court, state or federal, will admit this is a plain error and correct it.

16

Petitioner states that he is innocent of this crime and that evidence, wrongfully suppressed by the prosecutor, and the testimony of a witness, James Turner, whose testimony was[6] wrongfully excluded, demonstrate this petitioner's innocence.

Petitioner reiterates, that his newly discovered evidence outlined herein, (ground one) is not an abuse of the writ and is sufficient to make out the prima facie case required by 28 U.S.C. §2244 and §2254; and, his claim of abuse of discretion (ground two) which came about in 1991, should not be subject to a second or successive analysis because the issue did not exist at the time of petitioner's 1984 habeas corpus filing.

The facts: newly discovered evidence of the Commonwealth's star witness's undisclosed criminal record. A criminal record that was requested by the defense but purposely withheld by the prosecutor. The facts: a state Judge purposely misstated the testimony of two Officers of the Court, who testified that their client had been given an undisclosed deal in exchange for his testimony against petitioner. The facts: petitioner's attorney predicted that the judge would invent a reason to deny relief. And when the judge misstated pivotal testimony and used those misstatements to deny petitioner's claim, the attorney failed to preserve this issue for appeal, even after agreeing to do so, per request from petitioner.

---

[6]
    According to the proffer, largely confirmed by the state prosecutor who had heard Turner's testimony at the prior trial of petitioner's co-defendant, (Theodore Moody), Turner would tell the jury that while being transported with Hunter to City Hall, Hunter told him that he knew nothing about the case, but that he was going to get a car, some money, and his freedom from jail for testifying. Though Turner never met Hunter's attorney, John Scott, this is exactly what Mr. Scott testified to at the 1989 PCRA hearing.

Petitioner ask this Court to consider these facts together in conjunction with "all evidence", including that which was suppressed and that which was wrongfully excluded, in support of petitioner's Actual Innocence claim.

## II.   RELEVANT PROCEDURAL HISTORY

On August 20, 1975, a jury convicted petitioner of first degree murder and criminal conspiracy in the Philadelphia Court of Common Pleas under indictment numbers 1431-1432, January term 1975. Post verdict motions were denied by an En Banc Court, after which, the trial judge, the Honorable Jacob Kalish, sentenced petitioner to life in prison.

On direct appeal, the Superior Court of Pennsylvania affirmed the conviction in a published opinion, Commonwealth v. Griffin, 271 Pa Super 228 (1979). The Pennsylvania Supreme Court denied Allocator on April 1, 1980.

On or about April 17, 1984, petitioner filed a habeas corpus petition in this Court, (C.A. No. 84-1843), raising six claims. In a report and recommendation filed November 26, 1984, United States Magistrate Judge Peter B. Scuderi, after concluding petitioner had exhausted state remedies, reviewed the claims on the merits and concluded the petition should be denied as meritless and that there was no probable cause for appeal. On December 12, 1984, Judge Clarence C. Newcomber, approved and adopted that report and recommendation.

On or about September 23, 1993, petitioner filed a second habeas corpus petition, (C.A. No. 93-4862), under 28 U.S.C. §2254, raising the claims that: 1) Commonwealth "struck a deal" with key witness Calvin Hunter in order to obtain his

18

testimony: 2) trial counsel was ineffective for failing to produce evidence of the "deal", and 3) that trial court erroneously excluded testimony from a potential defense witness, James Turner, and trial counsel's ineffectiveness for failing to preserve that error for appellate review.

Petitioner's second habeas corpus petition was dismissed on or about March 28, 1994, for abuse of the writ.

On September 4, 2003, petitioner raised the following issues in Philadelphia Court of Common Pleas in a <u>properly and timely</u> filed manner under the Post Conviction Relief Act: 1) newly discovered evidence of sole witness's criminal record: 2) abuse of discretion by an earlier 1989 PCRA court: 3) the new evidence of undisclosed criminal record and old evidence of abuse of discretion combine to establish a miscarriage of justice: and 4) the ineffectiveness by the 1989 PCRA attorney for not preserving this issue on appeal.

After numerous filings in response to the Commonwealth's Notice Pursuant to Pennsylvania Rules of Criminal Procedures 907, (notice to dismissed), petitioner's PCRA petition was dismissed on October 26, 2004, as being "untimely" because petitioner failed to discover the suppressed evidence sooner.

On April 13, 2005, petitioner received the lower court's opinion and appealed to the Superior Court on May 23, 2005, which affirmed the lower court's ruling on October 26, 2005, stating "Appellant's newly discovered evidence claim was untimely filed because he failed to prove due diligence."

On November 7, 2005, petitioner filed a reconsideration motion to the Superior Court which was denied on January 4, 2006.

On January 31, 2006, petitioner filed a Petition for Allowance of Appeal to the State Supreme Court, which was denied on, July 19, 2006. Now comes this petitioner, pro se, seeking relief from the judgment of the state court, in the United States District Court under 28 U.S.C. §2254.

## III. STATEMENT OF FACTS AND EVIDENCE

### Evidence Presented At Hearings/Trial/Prior PCRA

On December 29, 1974, James Price, an inmate in custody at Holmesburg Prison in Philadelphia, was found in a cell, hanging from a sheet that was tied to a heating vent above the cell door. (Trial N.T. 173,193). Petitioner and two other inmates were tried separately and convicted for this murder.

The only evidence which linked petitioner to this crime came from another inmate, Calvin Hunter, (Hunter), who was only able to provide circumstantial evidence.

In addition, the Commonwealth presented evidence of possible motive in that petitioner had been charged with the seven "Hanafi" murders which had occurred in Washington, D.C. on January 18, 1973, and the now deceased James Price had testified against petitioner before a Washington, D.C. Grand Jury. (Trial N.T. 613, 614).[7]

---

[7] James "Bubbles" Price was one of the more renowned criminals in Philadelphia history, and there were many persons who had more than an obvious motive to kill him. Price had escaped punishment for the murder of Charles Ben Ami, a concentration camp refugee, whom Price killed during the robbery of his gas station in Philadelphia. Price also was a reportedly admitted major participant in the seven "Hanafi" murders in Washington, D.C., and had been successful in his defense in another murder all by implicating others while excluding himself. With this background, a veritable host of persons had ready motives to kill him. (1/25/89 PCRA hearing N.T. 99). This information was not brought out at petitioner's trial.

Petitioner was eventually acquitted of all charges arising out of the "Hanafi" murders, but his acquittal occurred after the instant trial.

Hunter, who was the only person out of about fifty other inmates and three corrections officers to testify against petitioner, testified at petitioner's preliminary hearing that he had been transferred from C to D block because of disciplinary reasons, and was locked into cell 453 on the day in question.

From this vantage point in cell 453, Hunter testified that he saw petitioner and two other inmates "escorting" Price down the corridor. (N.T. 288, 300). Hunter stated that he knew petitioner from the street, and to him it looked like a "football huddle".[8]

Hunter said that he heard screams, and shortly thereafter, saw petitioner and two other inmates coming from the direction of the back of the block. According to Hunter, he asked petitioner "what was all the noise about?" And was told "nothing that concerns you!" (N.T. 310-11).

Hunter was a drug addict and thief who was awaiting trial on charges of attempted burglary, fraudulent use of credit

---

[8]
Hunter claimed he made these observations from a dark 18 ft. cell with a perforated cell door, while he sat reading a cowboy book on his bunk that was situated against the back wall of the cell. However, this testimony came from Hunter's **typed second statement,** made on or about "January 2, 1975", the same day he plead guilty to the open charges he awaiting trial for. **His first statement, handwritten** on "December 29, 1974, the day of the murder, made no mention of seeing Price being escorted by petitioner or anyone. At that time Hunter said only that he had heard screams, and later saw petitioner and two others coming from the direction of the back of the block. **In fact, when asked if he had seen petitioner earlier, Hunter's handwritten statement shows he said "no".**

cards, burglary, and theft. (N.T. 329).

Petitioner's preliminary hearing was held on February 13, 1975 (N.T. 279), where Hunter made it clear to the court that no deals of any kind had been offered to him in exchanged for his testimony. And because it was a preliminary hearing where there was very limited testimony about any previous criminal activity, the impression was left that Hunter had only a prior conviction for burglary and related offenses for which he had served time for. **(Hunter died of a self-induced drug overdose before petitioner's trial).** [9]

The preliminary hearing notes read as follows:

> Q. Now, Sir, did anyone make any promises to you to come here today and testify?
>
> A. No.
>
> Q. No promises at all?
>
> A. No.   (N.T. 411)

And at the same hearing:

> By Mr. Johnson: Have you ever been convicted of any crimes here in Pennsylvania?
>
> Mr. Haines: Objection. Any crimes, period, Judge?
>
> By the Court: Well --
>
> By Mr. Johnson: Felonies.
>
> By the Court: Well, the question as stated -

---

[9]
Petitioner presents the notes concerning Hunter's deal not as proof of a previously litigated issue of the deal, and a previously litigated Brady violation; though the issue was obviously proven. But is presented to show that the 1989 PCRA court's misquoting and misrepresentation of factual testimony of two (2) credible attorneys, who both testified that their client, Hunter, received a deal in exchange for his testimony against petitioner, combined with the recent newly discovered evidence of Calvin Hunter's undisclosed criminal convictions, actually supports petitioner's claim of abuse of discretion and demonstrates a pattern of constitution violations.

By Mr. Haines: Doesn't the law prescribe some limitation as to questions like that, even on a preliminary hearing, Judge?

By the Court: The question as stated, the objection is sustained. Rephrase the question.

By Mr. Johnson: Have you had any convictions for felonies within the last two years?

A. The last two years?

Q. Yes.

A. Yes, sir.

Q. Serve any time?

A. Yes, sir.

Q. How much?

Mr. Haines: Objection; immaterial.

By Mr. Johnson: It may be to you, it's not to me.

By the Court: The objection is sustained.

By Mr. Johnson: Were you on parole?

Mr. Haines: Objection.

By Mr. Johnson: As a result of those previous convictions? (N.T. pg. 444)

By the Court: Just a moment. The objection to that is overruled.

By the Witness: What previous convictions?

By Mr. Johnson: The ones you told me about.

A. Yes, sir.

Mr. Johnson: Okay, that's all. (N.T. pg 445).

No further discussion took place concerning Hunter's prior criminal history. Due to Hunter's death by a drug overdose, the above colloquy, paired with Hunter's incomplete criminal extract, petitioner's trial jury heard nothing further about Hunter's prior criminal history.

On February 21, 1975, Hunter appeared before the Honorable Marvin Halbert for sentencing in his cases. The transcripts of that hearing conclusively show that the Commonwealth had definitely conferred benefits upon Hunter in exchange for his testimony. See (Exhibit C: Hunter's Sentencing Notes).

Hunter's sentencing, February 21, 1975, Judge Halbert:

> When you were here the other day -- Cliff Haines is a human being. Your counsel, the Defender, is a human being. Mr. Henry is a human being, and when I do this it is out of a deep and abiding feeling for you personally.
>
> Cliff Haines clearly conveyed to me the feeling it was out of a feeling for you and your safety that I want to view this, your safety and your future. (N.T. 2/21/75 pg. 2).

Indeed, at the conclusion of the sentencing hearing, notwithstanding the fact that no mention of cooperation has been made other than the conversation with Prosecutor Haines, the sentencing court asks:

> You have other instructions from Cliff Haines? (N.T. 2/21/75 pg. 9).

ADA Henry responds:

> As far as Mr. Hunter's cooperation on that other case, I am sure that the Court has taken into consideration. (N.T. 2/21/75 pg. 9, 10).

And the sentencing court then adds:

> <u>May I state for the record this entire sentence is predicated on Calvin's cooperation.</u> (N.T. 2/21/75 pg. 10).

Judge Halbert imposed a sentence of time-in to 23 months which amounted to 2½ months to 23 months to be followed by non-reporting probation, and then ordered that Hunter be placed in the custody of Chief Prosecutor Clifford Haines, who happened to be the prosecutor in petitioner's case.

On March 10, 1975, at a Discovery Hearing before the Honorable Judge Savitt, attorneys for the defense requested all discovery material, specifically any agreement of deals and Calvin Hunter's criminal record. And when an attorney for the defense complained that the criminal extract they had previously received was not legible, the court ruled that they would receive the witness's complete criminal record, and that it would be legible.

From the March 10, 1975 Discovery Hearing:

> The Court: With respect to the criminal record transcript of Calvin Hunter, does the district attorney have any objection to making that available?
>
> Mr. Haines: No, sir. (N.T. 3/10/75 pg. 11).
>
> The Court: All right. It is ordered and that the criminal record transcript of Calvin Hunter be made available to defense counsel. (N.T. 3/10/75 pp. 11, 12).

And during the same Discovery Hearing:

> Mr. Montgomery: Additionally, paragraph six has been denied. The Court in paragraph two, Mr. Haines said that he was agreeable to turning over the criminal record. We have been given the criminal record, Your Honor, and you can't even make it out.
>
> The Court: I don't want to discuss that at this point. You are going to get a criminal record that you can read. (N.T. 3/10/75 pg.35).

Within weeks of his release from prison, by Judge Halbert, Hunter was dead of a self-induced overdose of narcotics.

As a result, the notes of testimony from petitioner's aforesaid preliminary hearing, **(including Hunter's denial of any deals being given to him, his testimony of a very limited prior criminal history, and the same criminal extract that was complained about at the 1975 Discovery Hearing)**, were

read to petitioner's jury. And it was this evidence on which his conviction was predicated. (N.T. 279-455). [See criminal Extract Attached as Exhibit A].

At petitioner's trial, his attorney, Harold L. Randolph, a different attorney than those from the preliminary and discovery hearings, used the incomplete criminal extract that had been provided by the prosecutor in an attempt to show the jury that Hunter had reason to lie in hope of currying favor from the prosecutor, and that his credibility was suspect. In order to do this, trial attorney called ADA Michael Henry to the witness stand.

Mr. Henry was the prosecutor representing the State at Hunter's sentencing, and testified that he knew nothing of Hunter's prior criminal history, only that he was being sentenced for two burglaries and receiving stolen goods.

Petitioner's trial transcripts:

> Q. And at the time of sentencing, were you aware of the various charges on these particular bills?
>
> A. I believe I looked at the Quarter Sessions files in the courtroom on that day, February 21st. They were the only files I looked at that day, and the best of my recollection was that it was burglary, one or two burglary cases, that's all I can recall.
>
> Q. Now, what is that minimum-maximum sentence for burglary?
>
> A. Minimum and maximum?
>
> Q. Yes.
>
> A. Fifteen -- ten to twenty years.
> (N.T. pg. 909).

Trial attorney went on to elicit testimony from ADA Henry, to show that Hunter had two open burglary charges and a

receiving stolen goods, but received only a time-in to 23 months sentence, which amounted to (2½ to 23 months), to be followed by a period of probation.

Petitioner's trial transcripts:

> Q. At the time of sentencing, did you know that Mr. Hunter had been a state parolee, serving a one-to-three year sentence in the participation of a burglary, and a conviction from back in 1972?
>
> A. No, I did not.
>
> Q. Had that fact been known would you have made any different recommendations to the court?
>
> Mr. Haines: Objection.
>
> The Witness: I made no recommendations to the court. (N.T. pg. 912).

On page 913 of the Notes of Testimony, petitioner's trial attorney asked ADA Henry to view Hunter's criminal extract, again referring to the 1972 burglary conviction where Hunter served a one to three year sentence in the penitentiary.

Trial attorney also called to the stand, Ruth Goldberg, Clerk of the Quarter Sessions, Custodian of Records, to verify what he thought was Hunter's complete criminal record.

Ruth Goldberg testimony confirmed Hunter's time-in to 23 months sentence for the burglaries and receiving stolen goods. And when asked about Hunter's criminal extract, the testimony went as follows:

> Q. Is it the general practice of the Clerk of Quarter Sessions to supply the Court with what is called the criminal extract?
>
> A. Yes, sir.
>
> Q. That extract is there in the file now?
>
> A. Yes, sir.

> Q. Could you say that on the day of the
> sentence that in the ordinary course of
> business that it would appear in that file?
>
> A. Under normal conditions, but I don't know
> if it was there then.
>
> Q. Is that a two-page document?
>
> A. Yes, sir.
>
> Mr. Haines: Objection.
>
> The Court: Sustained. (N.T. pg. 942).

In each of the above colloquies, trial attorney tried to establish that Hunter had reason to seek favor from the prosecutor by continuously referring throughout the trial and summation, to Hunter's prior conviction for burglary. Had the the entire criminal record been there it would have been more than a two page document. The above also shows that trial counsel was unaware of Hunter's other convictions.

Mr. Randolph, on closing arguments:

> Now, Mr. Hunter presents a tremendous problem.
> He will, no doubt, present problems to you.
> First, I say you didn't see him, you don't
> know him. You don't know in what manner he
> testified, whether he was looking down or up
> at the ceiling, or what.
>
> You have the cold record as he related the
> events as he said he saw them.
>
> He presents another problem. .............
> ...... Mr. Hunter was in jail, locked up,
> charged with burglary, two burglaries,
> receiving stolen goods, forgery, conspiracy.
> And these are all crimes involving dishonesty,
> no doubt about it. (N.T. pg. 1023).

Randolph continues:

> But what happens to Hunter? Mr. Hunter came
> down here on January 2nd, got all his cases
> put together, two burglaries, everything.
>
> But, that was after December 29th, when he
> became a witness. That was after January 1st,
> when he gave another statement. (N.T. pg. 1025).

> Why did he do that? He had already gotten a
> one-to-three sentence for burglary. Why would
> he come down here on the 2nd of January and
> plead guilty to all these charges.
> (N.T. pg. 1026).

And:

> And, indeed, where a man has been convicted
> of a felony, such as burglary, or a
> misdemeanor, crimen falsi, especially a crime
> implying dishonesty, you take everything he
> said with a grain of salt.
>
> Not only has he been convicted before he came
> down on the 2nd of January to enter a plea of
> guilty, he had been convicted of burglary once
> before. (N.T. pg. 1027).

Trial attorney relying on the same barely legible criminal extract that had been presented to prior defense attorneys at the March 10, 1975 Discovery Hearing, attempted to challenge Hunter's credibility by referring to the previous burglary conviction and the lenient sentence he had received for the two present burglaries and related charges.

However, not only did Prosecutor Clifford Haines, keep quiet about Hunter's other criminal convictions, realizing the importance of Hunter's credibility to his case, he used his closing argument to bolster his witness's credibility. Though he knew that Hunter couldn't testify as an eyewitness to the murder because the Correction Officers had already testified that Hunter was locked in his cell. Still the prosecutor presented the following:

Prosecutor Haines on closing arguments:

> If Calvin Hunter was feeding us a line, if
> he were not telling the truth about what he
> saw, if he was making up a story to get
> somebody, wouldn't he make it much better?
> Wouldn't he say: I was out there, I saw
> them put him in 457, saw what they did to
> that man, I watched it. If Calvin Hunter

> was trying to sell something, he would
> have sold us an eyewitness account. (N.T. pp.
> 1073, 74).
>
> He had no motive, he had no reason save to
> say John Griffin, to say Theodore Moody, or
> Theodore Brown; there is nothing here to
> suggest to you that Calvin Hunter had any
> motive for saying he saw those three men walk
> Price down the cell block. (N.T. pg. 1074).

Prosecutor Haines, who also stated to the jury that Hunter
had no reason to lie. That he received no deal, and that he
received the sentence he received because he threw himself on
the mercy of the court and admitted his guilt, (N.T. pp.1071,
1072), had removed evidence of Hunter's motive when he with-
held from the defense a substantial portion of Hunter's
criminal record.

In his closing instructions to the jury, The Honorable
Judge Kalish failed to mention, (while speaking of Hunter's
testimony), any prior convictions as they might have related
to his credibility. However, while speaking of petitioner's
witnesses, the Judge made references to how the jury might
view the prior convictions of a witness.

Judge Kalish's closing instructions:

> The defendant's evidence that he was not
> present either by itself or together with
> the other evidence may be sufficient to
> raise a reasonable doubt of his guilt in
> your minds. (N.T. pg. 1117).
>
> Now, members of the jury, in this case
> there was also some evidence that some of
> the witnesses who testified had either pled
> guilty or were convicted for such crimes as
> murder, robbery, and burglary. You may
> consider this evidence of a conviction in
> deciding whether or not to believe all. This
> goes to the credibility of the witness.
> (N.T. pp. 1117, 1118).

And when Judge Kalish mentioned Calvin Hunter's pleading

guilty to a crime, he mistakenly called that crime a robbery. But when the prosecutor brought this to his attention, the judge corrected it in the following manner:

> The Court: Members of the jury, it has been called to my attention that I said that Calvin Hunter pled guilty to the crimes of robbery. Actually, it was burglary, not robbery. (N.T. pg. 1135).

However, Hunter did have a robbery conviction, as well as other burglaries and fraud cases that neither the defense nor the jury heard about because they were never disclosed.

In 1983, petitioner was transferred back to the state of Pennsylvania. He contacted the Clerk of Records at City Hall about any files on Hunter, and was told none existed. He then filed his first habeas corpus petition in April 1984.

In 1985, a year after his habeas petition had been denied, petitioner learned from one of the attorneys, (David Rosen), who had represented Hunter on the two 1974 burglaries, that Hunter had received a deal in exchange for his testimony against petitioner. After enquiring whether or not Rosen had any files on Hunter and purchasing the sentencing notes from the court stenographer, petitioner filed a Post Conviction under the then Post Conviction Hearing Act. See (Exhibit C - Rosen's letter and affidavit/ Hunter's sentencing notes).

In preparation for a scheduled post conviction hearing, petitioner's attorney, Norris Gelman, requested and received a copy of Hunter's criminal record. It was a copy of the same criminal extract that had been provided by the prosecutor at petitioner's 1975 trial. See (Exhibit B - letters from the attorney about Hunter's record and the criminal extract).

A PCRA hearing was held in 1989, before Judge McCrudden, where the two attorney, John Scott, and David Rosen, who had

represented Hunter on his 1974 Burglary charges, testified:

David Rosen's Testimony:

> The Court: Look, the question to you is - you're an attorney.
>
> The Witness: Right.
>
> The Court: Are you telling me now that there was a deal that's not on the record or there was a deal that's not on the record?
>
> The Witness: There was a deal that does not appear on the record.
>
> The Court: Does not appear on the record?
>
> The Witness: Yes. (N.T. pp. 48, 49).

Rosen's testimony continues:

> The Court: Do you find an ethical problem in this case or not?
>
> The Witness: Yes.
>
> The Court: What was the ethical problems?
>
> The Witness: If the District Attorney is saying that no deal was made with Calvin Hunter for his testimony, I think that's an ethical problem. And I became aware of that, I said when Mr. Gelman -- I was always under the impression that that would come out at the time of trial, that whatever deal, you know, that had been made. And it wasn't until Mr. Gelman got in touch with me and said well, the District Attorney represented there was no deal and I told him well, that's not my memory. (N.T. pp. 52, 53).

John Scott's testimony:

> He asked for expense or living money. He always had different ideas of how he should be taken care of, and again these may be several meetings. I know there were several conversations with Mr. Hunter and Mr. Haines, with myself and Mr. Haines, and the car idea was rejected. (N.T. pg. 65).
>
> By Mr. Gelman: Mr Scott, did you communicate to Mr. Haines, Mr. Hunter's desires about what he wanted in exchange for his testimony?
>
> A. He wanted no restraints per se.

Q. Did you tell that to Cliff Haines?

A. Yes, that clearly and so did Hunter.

Q. What did Haines tell you?

Miss Kofsky: Objection.

The Court: I'll allow it. Haines wanted him as a witness?

A. No question. (N.T. pg. 72).

Scott continues:

> .....he got out because he was in the Holiday Inn and the District Attorney's detectives, whose name I can't remember, had taken him over there and registered him for a couple of weeks period, had made sure, and he was not getting money in advance, so that comes back to me.

> They were going over paying him money or opening accounts so that he couldn't go and take off with a whole bunch of money, they were paying him for daily meals. The car as I said, was rejected but I just remember a conversation about we will get you a bus tickets and if he wants to leave town, we will go over and he can go get over to the bus and we will pay for the bus ticket.

> I don't think there was any strenuous objection if my bottom line recollection is right, to his not having to go to an in-patient drug program. It was going to be then that's when the non-reporting probation came into play. (N.T. pg. 74).

Scott continues on cross examination:

> By Miss Kofsky: Okay. Do you recall -- so far as you were concerned with these cases Calvin Hunter pled guilty, he had already served time and that was the end of it. Is that accurate? (N.T. pg. 86).

> A. Up to a point that's accurate, but there's also our discussions had with the Commonwealth with the prosecutor, Mr. Haines, and I don't recall if I had discussions with others. I'm sure I had discussions with the trial system in the courtroom which led to Mr. Haines. (N.T. pp. 86, 87).

However, even with the testimony from two attorneys, both of whom Judge McCrudden called credible, and Hunter's February 21, 1975 sentencing transcripts clearly showing that there was a deal, and that Prosecutor Haines had spoken with Judge Halbert. Judge McCrudden's 1991 Order and Opinion, used to deny relief to petitioner, misquoted and misrepresented the testimony from both attorneys. See ( Hunter's 2/21/1975 Sentencing Notes and Rosen's 3/12/2004 Affidavit with Judge McCrudden's Opinion attached as Exhibits C & D).

Petitioner, who was incarcerated at a federal facility in Three Rivers, Texas, at the time of the 1991 PCRA ruling, wrote his attorney and asked that it be made clear in the Appellant Brief that the PCRA Court had misrepresented and misquoted the testimony of the witnesses. See (Petitioner's 4/17/1991 letter to Norris Gelman, included in Exhibit E).

When petitioner learned that Mr. Gelman had not complied with his request, petitioner filed the brief in the Appellate Court, himself, but it was never accepted. See (7/15/1991 supplement Brief of Petitioner, Attached as Exhibit F).

Petitioner's family then hired Attorney Jules Epstein to pursue an appeal from the PCRA Court's ruling in District Court, (C.A. No. 93-4862), 28 U.S.C. §2254, but petitioner's habeas petition was dismissed due to abuse of the writ.

Before filing the above habeas corpus petition, Attorney Epstein contacted Hunter's sentencing judge, (Judge Halbert), to inquire whether or not the judge had any files concerning Hunter's sentencing, the deal, or anything else. However, Judge Halbert stated that he had no files on Hunter.

During the intervening years, petitioner's family hired

34

two separate investigators to search case files for evidence of the previous claimed, Brady violation. However, both investigators separately reported that they found no files on Hunter. See (Exhibits G and H, letters from investigators, Walter P. Lee, and Joseph Alercia).

In 2002, at the suggestion of the Centurion Ministries, a project established to prove the innocence of wrongfully convicted prisoners. Petitioner asked volunteer investigators to search for the medical examiner's report or DNA evidence, that might have been overlooked. They took it upon themselves to again speak with Judge Halbert, Hunter's sentencing Judge who was now retired. And in July 2003, after being told by Judge Halbert that any files, (on Hunter), he may have had would now be at the Prothonotary's Office. Investigator Barry Tiscornia and Para-Legal, Prudence Greco-Morgan searched case files and discovered some documents, but none that concerned the deal Hunter had been given. See (Exhibits I and J - Two Affidavits from investigators - Tiscornia and Greco-Morgan, and a Judge Halbert Letter).

On July 11, 2003, when all document found, (including some papers with Hunter's name in with petitioner's co-defendant, Theodore Brown's partial file), were sent to petitioner, he noticed papers showing convictions for Hunter that had not appeared on the original criminal extract that was provided to the defense at his trial. See (Attached Exhibit K).

Based on this newly discovered evidence, petitioner filed a PCRA Petition on September 4, 2003, fifty days after he received the documents. Two months after filing his PCRA Petition, Para-Legal Greco-Morgan obtained, by way of legal

35

subpoena, three (3) additional undisclosed convictions of
Hunter's located in the files of the Philadelphia County
Probation Office. In all, there were a total of six (6)
criminal (all crimen falsi) convictions that had not been
disclosed or made available to the defense for the purpose of
impeachment at petitioner's trial. The undisclosed criminal
convictions include, robbery, burglaries, shoplifting, fraud,
larceny, and forgeries. See (Exhibit L.)

ARGUMENT

> PETITIONER'S GOVERNMENTAL INTERFERENCE AND
> NEWLY DISCOVERED EVIDENCE  CLAIM SHOULD BE
> VIEWED AND  DECIDED ON  THE MERITS BECAUSE
> THIS CLAIM  COULD NOT  HAVE BEEN RAISED IN
> PETITIONER'S FIRST HABEAS CORPUS FILING.

In this case, petitioner's first habeas corpus petition
was filed in 1984 and denied on the merits. However, before
that filing, petitioner sought, from the Clerk of Records,
any existing files on the Commonwealth's lone witness, Calvin
Hunter, and was told that no files existed. Petitioner, nor
his attorney had reason to believe that the prosecutor had
withheld portions of his witness's criminal record. So when
petitioner was told that no additional files existed, he had
no reason to doubt that. (See Exhibit M:. An Affidavit)

Petitioner's newly discovered evidence claim involves the
withholding of exculpatory evidence by the Commonwealth of
Pennsylvania, whereas, the state prosecutor secreted portions
of his star witness's criminal record from the defense and
the jury at petitioner's trial. Because this evidence was not
provided to the defense as requested, and because the state
maintained that the partial criminal record it had provided

36

at trial was the complete record, the facts providing the predicate for this claim were unknown to petitioner and could not have been raised in petitioner's first federal habeas corpus petition. As a result, there is no inexcusable neglect or abuse of the writ situation. See McCleskey    v. Zant, 499 U.S. 467 (1991), the court explained that an abuse of the writ situation is one where petitioner could  have raised the claim before in the prior federal habeas petition and received a decision on the merits, but did not do so. I.d., 499 U.S. at 469. Also, in Sanders v. United States., 373 U.S. i, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1948) the Supreme Court explained abuse of the writ:  "If a prisoner deliberately withholds one or two grounds for federal collateral relief at the time of filing his first application, in hope of being granted two hearings rather than one, or for some other such reason he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground..." "Under the abuse of the writ doctrine, a numerically second petition is second when it raises a claim that could have been raised in the first petition but was not so raised, either due to deliberate abandonment or inexcusable neglect." McCleskey v. Zant, 499 U.S. 467 (1991).

In the legal analysis of McCleskey, supra, which expresses a thorough review of abuse of the writ. The legal standard announced is that a petitioner can excuse his failure to raise a claim in an earlier petition and thereby disprove abuse of the writ by either two means: a showing of cause for failing to raise the claim in the earlier proceeding and prejudice therefrom; or by showing that a fundamental

miscarriage of justice would result from a failure to entertain the claim.

In the instant case, a review of petitioner's present habeas corpus clearly shows that this new evidence, (of the Commonwealth witness's criminal record), is authentic, and that it was neither deliberately abandoned nor neglectfully left out of petitioner's first habeas corpus petition. And that in 1983-4, before petitioner filed his first habeas corpus, he contacted the Clerk of Records in an attempt to obtain any files on the Commonwealth's lone witness. Though petitioner was not looking for additional criminal records, and was trying to locate any files that might support his suspicions that Hunter had received a deal from the state in exchange for his testimony against petitioner, petitioner's efforts proved fruitless because he was told that no such files existed. It was not until after petitioner's 1984 federal habeas corpus petition had been filed and then denied that information surfaced concerning the deal Calvin Hunter had received. See (Exhibit D - David Rosen's 1987 affidavit concerning the deal his client received in exchange for his testimony against petitioner). However, though there were also further requests made at that time for Hunter's criminal record in preparation for an evidentiary hearing, still the prosecutors provided the same partial criminal history. See (Exhibit B - Attorney Gelman's request for Hunter's criminal file and the file he received). Thus, petitioner reiterates, he did not purposely withhold this issue, nor did he neglect to include it in his first federal habeas corpus petition. It had been suppressed by the state prosecutor.

38

NEWLY DISCOVERED EVIDENCE COULD NOT HAVE BEEN
DISCOVERED PREVIOUSLY THROUGH EXERCISE OF DUE
DILIGENCE.

The ruling of the State Court demonstrates a miscarriage
of justice and is in error of its own State Constitution and
contrary to Federal Law. The only people who had knowledge
of the newly discovered evidence, which is the predicate for
petitioner's present habeas corpus petition, were Prosecutor
Clifford Haines, Prosecutor Michael Henry, Clerk of Quarter
Sessions, Ruth Goldberg, and Calvin Hunter, the sole witness
for the Commonwealth. The suppressed portion of evidence
contained within the witness's criminal record could not have
been discovered through the exercise of due diligence.

The federal courts have consistently held that evidence
within the purview of government officials, secreted by them,
withheld by them, or concealed by government conduct, is
evidence that could not have been discovered through the
exercise of due diligence. See, e.g., Dobbs v. Zant, 506
U.S. 357 (1993)(per curiam)(transcripts not discovered based
on defendant's reliance on the State's assertions that it had
not been transcribed); Price v. Johnson, 334 U.S. 266, 289
(1948)(prosecutor's knowing use of perjured testimony);
Kirkpatrick v. Whitley, 992 F.2d 491, 495-6 (5th Cir. 1993)
(information hidden in undisclosed police report); Fairchild
v. Lockhart, 979 F.2d 636 (8th Cir. 1992)(prosecutor did not
turn over sheriff's file containing exculpatory information);
United States v. Biberfield, 957 F.2d 98, 104 (3rd cir. 1991)
(government withheld information that testimony of witness
was false); Hamilton v. McCotter, 772 F.2d F.2d 171, 182 (5th
Cir. 1985)(newspaper report that the prosecutor had forged

39

indictment); Paradis v. Arave, 130 F.3d 385, 394 (9th Cir.
1997)(prosecutor withheld exculpatory information at the time
of the criminal trial and successfully quashed a subpoena for
documents at the time of the first habeas petition); Banks
v. Dretke, 124 S.Ct. 1256 (2004)(state hid information of an
informant and misleadingly represented that it had complied
in full with its Brady disclosure obligations). See also,
Strickler v. Greene, 527 U.S. 263, 282, 289 (1999)(conduct by
state in impeding access to exculpatory information provided
cause for filing a successive petition.) Strickler v. Green,
supra, stands for the control of the proposition that any
extraordinary obstructive circumstance beyond the control of
the applicant and his attorney, in which both were faultless,
amounts to justification for a successive petition. Obviously
here, there is no way that the petitioner's defense could
have forced the Commonwealth, (Prosecutors Haines, Henry, and
Ruth Goldberg, Clerk of Quarter Sessions and Custodian of
Records), to reveal the information known to them. Though the
defense took every necessary step required by law to secure
all exculpatory evidence, including the complete criminal
record of Calvin Hunter, the defense only received misleading
and partial information about this witness. Likewise, this
deception continued after petitioner's trial, when various
attorneys representing petitioner, requested any additional
information and criminal files on this witness, and was told
none existed, or was given the exact same incomplete files
previously presented to defense as being complete.

Despite all efforts to locate further information on this
witness, none was forthcoming until investigators happened to

have a **second** conversation with the retired sentencing Judge
of Calvin Hunter about any files he may have that might shed
some light on the "deal" Hunter had received. This fortuitous
find of newly discovered criminal records had been unknown to
petitioner and those who had acted on his behalf. Thus, no
one had reason to search for what they did not know existed.
See Moore v. Knight, 368 F.3d 936 (7th Cir. 2004), where the
court, upon considering the timeliness of a defendant's newly
discovered evidence of a Judge's ex parte communication with
jurors, states:

> "Prior to receiving the letter and affidavits, Moore
> did not know any specific information about what had
> transpired between the Judge and the jurors, he could
> only speculate as to what may have been said."

That Court went on say:

> "It was not until Moore discussed the matter with Storms
> that he had reason to suspect the content of Judge
> Smith's communication to the jury was different than
> she had represented, and it wasn't until Moore obtained
> the juror's affidavits that he had specific, concrete
> information regarding what had transpired, upon which
> he could base his claim." Moore v. Knight, supra, at
> 939.

This Court has previously noted that a "due diligence"
inquiry should take into account that prisoners are limited
by their physical confinement. Montenegro v. United States,
248 F.3d 585, 592 (7th Cir. 2001); Ashley v. United States,
266 F.3d 671 (7th Cir. 2001); and see Easterwood v. Champion,
213 F.3d 1321, (10th Cir. 2000), quoted by Moore v. Knight,
supra, at 940. "Similarly, we agree with the Second Circuit's
observation that 28 U.S.C. §2244 does not require "the
maximum feasible diligence" but only "due or reasonable
diligence." Wims v. United States, 225 F.3d 186, 190 n.4 (2d
Cir. 2000).

The facts of this instant case clearly demonstrates that petitioner acted with due diligence in attempting to locate evidence that supported information he was aware of. Because the undisclosed portions of the state witness's criminal record had been conveniently and continuously withheld from the defense, before, during, and after trial, petitioner was impeded and could not have possibly raised this claim in his 1984 habeas corpus petition.

Herein, petitioner argues that, because this undisclosed evidence was both favorable and material to his case, he was prejudiced when this information was withheld.

According to United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985), such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." id., at 682; also see Kyle v. Whitley, 514 U.S. 419, 433-434, 155 S.Ct. 1555 (1995), where the Court held that, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case, including the police."

The undisclosed convictions unavailable on the witness's criminal extract consisted of prior burglaries, larcenies, forgeries, and a robbery, in which the witness, Hunter, had served time for. Had these criminal convictions, (along with information of the myriad of aliases and different addresses used by this witness) been made available to the defense at trial, the attorney for petitioner would have been better able to impeach the credibility of Hunter. See Hollman v. Wilson, 158 F.3d 177 (3rd Cir. 1998), United States v. Auten,

632 F.2d 478 (1980), "The basic import is that there is an obligation on the part of the prosecutor to produce certain evidence actually or constructively in its possession or accessible to it in the interest of inherent fairness." Also, see United States v. Risha, No. 04-4677 (3rd. Cir. 2006) "We construed the term "constructive possession" to mean that although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence." and United State v. Joseph, 996 F.2d 36 (3d. Cir. 1993); United States v. Perdomo, 929 F.2d 967 (3d. Cir.1991); where a Brady violation may be found despite a prosecutor's ignorance of impeachment evidence. "This may be especially true when the withheld evidence is under the control of a state instrumentality closely aligned with the prosecution." United States ex rel. Smith v. Fairman, 769 F.2d 386, 391 (7th Cir. 1985).

In this instant case, a part of the undisclosed evidence was found in the possession of the State Parole and Probation Department. A state agency closely aligned with the state prosecution in this case because Hunter was guaranteed non-reporting probation and parole in exchange for his testimony against petitioner.

In Perdomo, supra, the court held that the prosecution's failure to conduct a basic search of their star witness's criminal background was sufficient to charge the state with constructive possession of the exculpatory information they would have found had they undertaken the investigation. And in United States v. Thornton, 1 F.3d 149, 158 (3d. Cir. 1993) the court stated: **"prosecutors have an obligation to make a**

43

thorough   inquiry of all enforcement agencies that have a potential connection with their witnesses." Also, the Court in Carriger v. Steward, 132 F.3d 463 (9th Cir. 1997) "In this case, Dunbar was the prosecution's star witness and was known by police and prosecutors to be a career burglar and six-time felon, with a criminal record going back to adolescence."

In petitioner's case, as in Carriger, Calvin Hunter, the star (only) witness to connect petitioner with this case, had a criminal record dating back to adolescence. He was known by the police and prosecutors as a drug addict, forger, burglar, and career criminal. In fact Hunter's undisclosed criminal record shows that, at age 26, he had been arrested for at least two burglaries each year since he had turned 18.

While petitioner's jury was led to believe that Hunter had only one prior conviction for which he had served a 1-to-3 year sentence for. He had actually served multiple 1-to-3 year sentences for separate burglaries, as well as additional sentences for forgeries, robbery and shoplifting. Hunter also used many aliases and different addresses.

The Defense never received, and the jury never heard any of this information. In addition, neither the defense nor the jury knew that Hunter had committed more burglaries while he was waiting to have a judge terminate his probation for a prior burglary if he would agree to enter the Air Force.[10] See (Exhibit K - Order from Judge Lowe to the District Attorney's Office authorizing termination of probation.)

---

[10] Like so many of these cases, this case did not appear on Hunter's criminal extract that was provided by the prosecutor to the defense at trial.

Had any of this evidence of Hunter's prolificacy in his profession been known, the defense could have used it to thoroughly challenge Hunter's motive for testifying. Trial attorney would have been better equipped to challenge the comments of the prosecutor, who maintained that Hunter had no reason to lie, and that Hunter received the lenient sentence he received "only because he threw himself on the mercy of the court and admitted his guilt." Had this undisclosed information, (the complete criminal record), been available, petitioner's attorney could have also demonstrated to the jury that Hunter's use of so many aliases and false addresses was an indication of his propensity for lying, i.e., showing Hunter had previous lied to police, prosecutors and judges.

Petitioner has made a prima facie showing of cause for not raising the claim supported by this newly discovered evidence in his first federal habeas corpus in 1984. He has also shown prejudice that resulted from the withholding of this evidence from his defense at trial, i.e., (the absence of Hunter's complete criminal record deprived him of a fair trial; **first,** by enabling the prosecutor to mislead the jury into thinking that Hunter had a limited criminal history and thus had less of a reason to be bias; **second,** the defense was deprived of the opportunity to impeach using the complete record; **third,** the prosecutor was able to bolster Hunter's credibility in his closing arguments, see (N.T. trial pg. 1073-74); and **fourth,** the jury instructions by the trial judge buttressed the credibility of Hunter, while challenging the credibility of the defense witnesses. See (N.T. trial pp. 1117-18, 1135).

Hunter's criminal record known only to the Commonwealth is

45

new evidence and could not be discovered despite the exercise of due diligence on the part of petitioner and his attorneys.

Petitioner should not be penalized for presenting an issue to this Court that he was unable to raise in his first and only habeas petition because of the misconduct of the state. See Reed v. Ross, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984)("The failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met"); see also Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)("[A] showing that the factual or legal basis for a claim was not reasonably available to counsel,...or that 'some interference by official' made compliance impracticable, would constitute cause under this standard." (citation omitted.)) See Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999). "We agree with other circuits that have explained that 'the availability of information is not measured in terms of whether information is easy or difficult to obtain but by whether the information is in the possession of some arm of the state. See also United States v. Perdomo, 929 F.2d 967, 971 (3rd Cir. 1991); and Martinez v. Wainwright, 621 F.2d 184, 186-87 (5th Cir. 1980). We conclude, therefore, that the state did, as a matter of law, improperly withhold Child's criminal history record from Crivens."

As in Crivens, supra, this petitioner has also shown that there is no procedural default for cause. And likewise, prejudice occurred from the state's inappropriate action. The Commonwealth's entire case rested upon Hunter's testimony about seeing petitioner escorting Price and then returning up

the (cellhouse) block after he had heard screams. Hunter's run-ins with the law and lying repeatedly about his identity and where he lived, would certainly have cast some doubt on his credibility as a witness. It would have perhaps given the jury reason it did not find to decide that he might be lying again. And had all those crimen falsi convictions come to light, the jury would have certainly had good reason to find that Hunter had reason to lie.

Petitioner, again avers that the allocation of the burden should not be placed upon him to search for criminal records that he did not even know existed - especially when the state had an obligation to provide them. <u>Giglio v. United States</u>, 405 U.S. 150 (1972). The State Supreme Court and Superior Court of Pennsylvania erred in affirming the PCRA Court's ruling that petitioner newly discovered evidence claim was "untimely". Especially in light of the State Supreme Court's recent decision in <u>Commonwealth v. Lambert</u>, 884 A.2d 848 (Pa. 2005), **"Therefore, so long as the facts set forth in the police file were not otherwise known to appellant, the Brady claims he asserts are 'timely' under the newly discovered evidence exception."** <u>Lambert</u>, supra, at 852. Emphasis added.

The instant case parallels Lambert, in that the facts upon which petitioner's claim is predicated were not known to him before or during his trial. Nor could these facts have been ascertained prior to Judge Halbert's cooperation because up until 2003, each request for possible files of this witness had been viewed as negligible. And since petitioner and his trial attorney had been misled into thinking that there were no additional criminal records they did not suspect that the

47

prosecutor had not complied with the order issued by Judge Savitt at petitioner's discovery hearing. (N.T. 3/10/75 pp. 11, 12 & 35)

The Pennsylvania Courts have held: "The only exception to the requirement of reasonable diligence in seeking evidence during trial is the situation where the Commonwealth knowingly misleads the defendant." Commonwealth v. Venable, 96 Dauph. 484 (1974); also see Commonwealth v. Swarney, 16 Cambria 209 (1952), " ... the rule requiring diligence in discovering new evidence is materially affected by the adversary's false testimony and does not operate to impose on the party seeking a new trial the burden of suspecting, since a party was entitled to assume that the adversary's positive testimony under oath was true." In this case, the adversary was the Commonwealth, and petitioner was led to assume that the prosecutor had indeed complied with the defense request, and the judge's order, for "all exculpatory evidence."

If this Court concludes that, due to interference from the Commonwealth, petitioner's claim could not have been raised in his first federal habeas corpus. This Court must conclude that petitioner's claim is a legitimate Brady violation.

Under Brady v. Maryland, 373 U.S. at 87, the prosecutor's suppression of evidence favorable to a criminal defendant violates due process when the evidence is material to guilt or punishment. To establish a Brady violation, it must be shown that (1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment. See, e.g., United States v. Pelullo, 399 F.3d 144, 154 (3d Cir. 2003). This case turns on the

48

answer to the first Brady inquiry, that is whether the state
prosecutor suppressed relevant impeachment information.[11]

There is no doubt that Hunter's criminal record was requested by the defense at petitioner's discovery hearing, and that the prosecutor agreed to provide it. There is also no doubt that portions of Hunter's criminal record was later discovered by investigators looking for evidence that might have supported the claim of an "undisclosed deal". And there is also no doubt that what the prosecutor presented to the defense at trial and claimed was Hunter's entire criminal record, was not Hunter's entire criminal record. This was a suppression of the greater part of Hunter's criminal record, and amounted to governmental interference, denying petitioner the precepts of Brady, which are premised upon the most basic of constitutional guarantees to a person accused of a crime: a right to due process of law and a fair trial.

> " ... Simply put, in our system of criminal justice, the
> government is not entitled to send a person to prison
> while it conceals from him favorable evidence that would
> tend to reasonably call into question his guilt ..." See
> Simmons v. Beard, 356 F.Supp 5483 (W.D.PA. 2005).

---

[11]
     There can be no dispute that the information in question
is favorable to the defense because - the jury was told that
Hunter had nothing to gain from his testimony. The prosecutor
based his entire case on Hunter's credibility and then misled
the jury into believing that Hunter's criminal history was
very limited. Thus, this information could have been used to
impeach Hunter's testimony. Likewise, there can be no dispute
regarding materiality. Evidence is "material" if there is a
reasonable probability that pretrial disclosure would have
produced a different result at trial. The question is not
whether disclosure would have resulted in a different
verdict, but whether suppression of the evidence "undermined
confidence in the outcome of the trial." Kyles v. Whitley,
514 U.S. 419, 434-35 (1995)(emphasis added). The jury could
have concluded that Hunter, **who was the sole witness offering
incriminating evidence against petitioner**, was lying out of
personal interest.

49

THE NEWLY DISCOVERED FACTS, IF PROVEN, AND IN LIGHT OF EVIDENCE AS A WHOLE, ARE SUFFICIENT TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE, BUT FOR CONSTITUTIONAL ERROR NO REASONABLE FACT - FINDER WOULD HAVE FOUND THE PETITIONER GUILTY OF THE UNDERLYING OFFENSE.

First, it is manifestly clear that if the undisclosed part of Calvin Hunter's criminal record was not made available to the defense for purposes of trial, then the prosecutor denied petitioner his constitutional right to due process and a fair trial. Prosecutor Clifford Haines was ordered by Judge Savitt at petitioner's March 10, 1975, discovery hearing, to provide all exculpatory evidence, including the criminal record of the state's sole witness against petitioner. And though he agreed to do so, Prosecutor Haines secreted portions of this critical exculpatory evidence from the defense and falsely testified, thus misleading the defense and the jury into believing that all the evidence concerning this very crucial witness's criminal past was before the court. This was a clear constitutional violation denying petitioner due process of law under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. The prosecutor's failure to disclose material exculpatory evidence violated petitioner's right to a fair trial. Brady v. Maryland, supra; U.S. v. Bagley, 473 U.S. 667 (1985). Prosecutor Haines then used the fact that the defense had no knowledge of the undisclosed material to his advantage by misleading the jury, and vouching for his sole witness's credibility. Under the circumstance, his actions were also a clear constitutional violation. As made absolutely clear in Alcorta v. Texas, 355 U.S. 28 (1957), when the government knowingly presents a false picture of the evidence to the jury, a new trial is warranted. And it is axiomatic that a

conviction obtained through false testimony is obtained in violation of due process. Napue v. Illinois, 360 U.S. 264 (1959); Miller v. Pate, 386 U.S. 1 (1967). When the prosecutor misleads the court, the verdict should be invalidated, and when, as here, the government's fraud presents a deliberate scheme to directly subvert the judicial process, a reversal is mandated. Alcorta v. Texas, supra.

Suppressing or withholding of Brady material constitutes a constitutional error when the "evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678, 105 S.Ct. 3375. Hunter's testimony forms the heart of the state's case against petitioner. The jury based its finding solely upon the testimony of Hunter, who testified that he saw petitioner and two others "escorting" Price down the block, then heard screams, "their killing me", before seeing petitioner and the two other inmates return. There was only one finger pointing at petitioner, and that finger belonged to Calvin Hunter.

While the fact that Hunter had prior convictions might not in and of itself have deterred the jury from convicting petitioner based on Hunter's testimony, Hunter's use of aliases as they related to these convictions could have damaged his credibility in the eyes of the jury. By assuming new identities, different birth dates, and using a number of different addresses, Hunter demonstrated a propensity to lie to police officials, prosecutors, and even judges. Thus his criminal history indicates the ease with which he has lied to such individuals in the past and could have impacted the

jury's assessment of his credibility. Likewise, knowing about
Hunter's criminal record could have also caused the jury to
disbelieve Prosecutor Haines' argument that Hunter had "no
reason to lie, and that his admittance of guilt resulted in
him receiving a lenient sentence", oppose to trying to curry
favor with the Commonwealth.

However, if petitioner's jury had been allowed to consider
Hunter's complete criminal record, they might have also given
more weight to the fact that, out of about fifty (50) other
inmates and three (3) corrections officers on the block that
day, Hunter was the only person claiming to have saw or heard
those things. The jury might have also given more weight to
the fact that Hunter's first statement made no mention of
seeing petitioner and other inmates escorting Price down the
block. They might have concluded that Hunter had been advised
by "someone" to place the defendants with the victim prior to
the murder. Something his first statement had failed to do.

If Hunter's credibility had been damaged, the state's case
would have been seriously damaged. And petitioner argues that
the introduction of Hunter's complete criminal history and
his habit of lying to police and judges could have affected
his credibility, and would have led the jury to a different
verdict.

The Supreme Court has opined that credible claims of
constitutional error that have caused the conviction of an
innocent person are rare, but that when they are indeed
substantiated by new evidence not presented at trial, that
is, when the evidence taken as a whole demonstrates that it
is more likely than not no reasonable juror would have found

guilt beyond a reasonable doubt, a petitioner should be granted relief from his conviction. Schlup v. Delo, 513 U.S. 298, (1995); Sawyer v. Whitley, 505 U.S. 333 (1992); Murray v. Carrier, 477 U.S. 478 (1986). Such a demonstration requires a court to perform a complete review of the entire panoply of evidence, even that which was previously excluded from the trial. As the Court stated in Schlup, supra at 867:

> "The habeas court must make its determination concerning the prisoner's innocence in light of all the evidence, including that ... tenably claimed to have been wrongly excluded or have become available only after trial."

An analysis of innocence under AEDPA also requires that all of the evidence be considered in a successive habeas claim. As set forth in 28 U.S.C. §2244, any analysis of new evidence and innocence must occur in the light of the **evidence as a whole.**

Importantly, this petitioner has never had the entire panoply of evidence supporting his innocence evaluated as a whole before. Indeed, in light of the new evidence found by investigators, this now must be done, and if it is fairly done, will undoubtedly lead to one conclusion, i.e., that no reasonable juror could find petitioner guilty beyond a reasonable doubt.

**A showing of actual innocence can be made with evidence known, but not presented at trial:** the evidence secreted by prosecutor Haines was not the only evidence not presented at petitioner's trial. When the defense offered a witness named James Turner to impeach the testimony of Calvin Hunter in several respects, the testimony from this witness was wrongly excluded. (N.T. 931-936).

According to the proffer, largely confirmed by the state prosecutor, who had heard Turner's testimony at the prior trial of petitioner's co-defendant, (Theodore Moody), Turner would tell the jury that he was an inmate who had been transported to City Hall in the company of Calvin Hunter, who was still in prison at that time. Turner would have related to the jury that he had a conversation with Hunter, wherein, Hunter said that he had been down to Washington, D.C., and working on the matter involving this petitioner. Turner said Hunter then told him that he really didn't know anything about either case, but that he was a commonwealth witness and a deal had been worked out for him to get certain rewards, such as money and a car for doing this. (N.T. pg. 933).

Petitioner's jury never heard James Turner's testimony because it was objected to by the prosecutor and sustained by the trial judge. This testimony would have shown bias on Hunter's part, and would have presented a jury question of petitioner's actual innocence.

Though James Turner and Hunter's attorney, John Scott never met one another, when Attorney Scott gave his testimony 14 years later, at petitioner's PCRA hearing, his testimony was essentially the same concerning Hunter's expectations from the prosecutor; money and a car. (N.T. pg. 65).

An actual innocence review must incorporated all evidence, including that alleged to have been wrongly excluded or to have become available only after the trial. See Griffin v. Johnson, 350 F.3d 956 (9th Cir. 2003), and Gomez v. Jaimet, 350 F.3d 673 (7th Cir. 2003) "newly presented evidence may be considered ... a court is not limited to considering only

newly discovered evidence in determining whether the petitioner's actual innocence claim excuses his procedural default."

Petitioner states that if the jury had heard all the evidence, including Hunter's undisclosed criminal history, along with his propensity for lying, the evidence of a deal as testified to by Hunter's attorneys, and the testimony of James Turner's conversation with Hunter, the jury's verdict would have been different.

ABUSE OF DISCRETION SHOWN BY A 1991 RULING OF THE PCRA COURT INVOLVING A PRIOR BRADY CLAIM SHOULD BE REVIEWED BY THIS COURT AND DETERMINED AS BEING A NON - SUCCESSIVE ISSUE THAT DID NOT EXIST WHEN THE PETITIONER FILED HIS FIRST HABEAS CORPUS PETITION.

Petitioner states that the 1989, Post Conviction Hearing Court deprived this petitioner of a fair and impartial adjudication of the pleading in issue by misrepresenting, misquoting, and modifying the testimony of two witnesses, (both attorneys), who testified that their client received a deal from Prosecutor Haines in exchange for his testimony against petitioner.

The facts underlying this issue: On January 25, 1989, and, February 28, 1989, PCRA hearings were held before Judge James D. McCrudden involving the issue advanced in petitioner's PCRA petition. In support of his pleadings, that the sole witness for the Commonwealth, Calvin Hunter, was given an undisclosed deal by the prosecution in exchange for his testimony against petitioner. Petitioner called two of Hunter's prior attorneys, who represented Hunter on his two 1974 burglaries and related charges. Both attorneys were from

the Philadelphia Public Defenders Association, and testified that Hunter had received a deal or had benefits conferred upon him in exchange for his testimony against petitioner.

Attorney John Scott, testified that he was the attorney who was first asked by Hunter to contact Assistant District Attorney Clifford Haines, and tell him what Hunter wanted in exchange for his testimony. Scott testified that Prosecutor Haines stated to him that one of the demands Hunter had was out of the question, but others were negotiable. (PCRA N.T. pp. 65, 67-8, 72, 74-5, 85, 87, 90, 95).

Attorney David C. Rosen, who was appointed to represent Hunter after Scott left the case, but before the deal between Hunter and the prosecutor had been completed, testified at the PCRA hearing that he was instrumental in negotiating the final points of the deal for his client (Hunter) in exchange for Hunter's testimony against petitioner. (PCRA N.T. pp. 18, 23, 26, 32, 35, 48, 55).

Both attorneys, Rosen and Scott, were disinterested witnesses who had no purpose in testifying other than they were Officers of the Court, under subpoena, and sworn to tell the truth.

However, though the PCRA Court focused on the testimony of the above mentioned attorneys, whose testimony supported petitioner's Brady claim, as well as a claim of perjury by both the witness, Hunter, and the State Prosecutor, the PCRA Court Judge inexplicably stated in his 1991 written opinion:

> "... Counsel who represented Hunter at his guilty plea before Judge Halbert, testified that no one in the District Attorney's office promised Calvin Hunter anything in exchange for Hunter's testimony. Counsel who represented Hunter at the sentencing before Judge

Halbert stated that he was not aware of any deal and did not participate in any negotiations on Hunter's behalf or between Hunter and the District Attorney's office. We find this testimony to be credible ..." **See (Judge McCrudden's Opinion Attached to David Rosen's 3/12/2004 Affidavit as Exhibit D).**

It is inconceivable how the PCRA Court could have reached that conclusion after the court so vigorously examined both attorney's testimony. A cursory review of the PCRA hearing's transcripts of Attorneys Scott and Rosen's testimony would reveal clearly that the misstatements contained within Judge McCrudden's 1991 Order and Opinion constitutes plain error, because they constituted "statements of fact not supported by proper evidence." U.S. v Gartmon, 146 F.3d 1015 (D.C. Cir. 1998)." See United States v. Young, 470 U.S. 1, 10-11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), United States v. Edelin, 996 F.2d 1238, (D.C. Cir. 1993), and United States v. Watson, 171 F.3d 695 (D.C. Cir. 1999) "It is error for counsel to make a statement in closing argument unsupported by evidence, to misstate admitted evidence, or to misquote a witness's testimony."

In the instant case the judge misstated the testimony of two witnesses, (both attorneys), whose testimony supported petitioner's claim. See Commonwealth v. Irwin, 431 A.2d 257 (Pa. 1981), "It is clearly within discretion of trial judges to summarize for the jury evidence adduced at trial; trial judge however, must, avoid material misstatements of evidence presented in case." Commonwealth v. Crawford, 305 A.2d 893 (1973), "A material misstatement involves a 'variance between the testimony of the witness and the judge's account of it .. of such a nature as to seriously .. prejudice the interest

57

of the defendant and deprive him of a fair trial'". And also, Commonwealth v. O'Brien, 168 A.2d 244 (1933), " Where the misstatement involves the most important evidence on a crucial legal question or vital evidentiary point in the case, it may seriously prejudice the defendant's case and is often considered reversible error." The testimony of Attorney David Rosen and Attorney John Scott was clearly important to petitioner's case because they supported the argument that Hunter had been given a deal by the prosecutor. For the judge to misstate this testimony and then use this misstatement as the reason for denial, constitutes an error. Watson, supra, at 700, "A misstatement of evidence is error when it amounts to a statement of fact to the jury not supported by proper evidence introduced during trial, regardless of whether counsel's remarks were deliberate or made in good faith, see Gartmon, supra, 146 F.3d at 1025", and Watson, supra, 171 F3d at 700, "That Watson is entitled to a new trial by reason of the error is demonstrated by application of this circuit's test designed to determine whether a defendant has suffered sufficient prejudice to warrant a new trial. see Gartmon, 146 F.3d at 1026. The test consist of three factors: "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error."

The prejudice suffered by petitioner in this case was much more egregious than that explained in the above cited cases because petitioner was before a judge who was the final arbiter at his evidentiary hearing. It was this judge who had asked most of the questions of these two witnesses and heard

their testimony in support of petitioner's claims. The PCRA Court's misstatements of this evidence was subsequently used by that court, in the judge's final Order and Opinion, as the only reason for denying petitioner's claim. There was no jury and the petitioner had no opportunity to request that the court give a curative instruction. Thus, there was no opportunity of having this error mitigated from the very same judge who committed the error. The purpose of the evidentiary hearing was to consider, fairly and impartially, any and all evidence concerning a possible undisclosed deal given to Calvin Hunter, the only witness for the Commonwealth. Both of Hunter's attorneys testified that he had received such a deal in exchange for his testimony against petitioner. The record will show there was no other evidence, other than Hunter's testimony, that connected petitioner to this crime. Thus, petitioner was prejudiced by this misstatement. This issue affected by the judge's misstatement was central to the claim petitioner raised before the court. And this misstatement was not mitigated, either by the judge who made the misstatements or by petitioner's attorney who failed to preserve this issue on appeal.

The misstatements made by PCRA Court Judge McCrudden, occurred in 1991 and constitutes the bases for petitioner's claim of abuse of discretion. This issue, which did not exist in 1984, at the time petitioner filed his first habeas corpus petition and it could not have been raised at that time. See Benchoff v. Colleran, 404 F.3d 812, (3d. Cir. 2005), "When courts have permitted a petitioner to challenge the administration of his or her sentence in a subsequent habeas

petition, the challenged conduct has occurred after the filing of the earlier petition." In Hill v. State of Alaska, 297 F.3d 895 (9th Cir. 2002), quoting In Re: Cain, 137 F.3d 234, 235 (5th Cir. 1998), "That a prisoner has previously filed a federal habeas petition does not necessarily render a subsequent petition "second or successive." See also Crouch v. Norris, 251 F.3d 720 (8th Cir. 2001), "State prisoner's proposed habeas challenge to the execution of his sentence should not be deemed "second or successive" merely because he previously filed a habeas challenge to the constitutionality of his convictions; proposed petition was not abusive because he could not have raised his parole-related claims in his first habeas petition because his first parole denial was dated after he filed his first petition. 28 U.S.C.A. §2244(b) (3)(A), 2254." Crouch, supra, at 721.

Although petitioner's issue differs from that of Crouch's, parole issue, both raised questions of constitutionality and both issues did not exist at the time the first habeas corpus was filed. Walker v. Roth, 133 F.3d 454, 455 (7th Cir. 1997) (per curiam) holding, "petition was not successive where it challenged petitioner's resentencing when that resentencing was the result of the petitioner's first habeas petition challenging his conviction."

In the instant case, the judge conducting the evidentiary hearing purposely misstated the testimony of witnesses who came forth and supported petitioner's claim of a Brady violation. This hearing, (which occurred 5 years after this petitioner filed his first habeas petition), was the result of a challenge to petitioner's conviction. However, to hold

that petitioner is now barred from challenging constitutional
violations that occurred at this hearing, would be contrary
to the ruling of the United States Supreme Court. In Slack
v. McDaniel, 529 U.S. 473, (2000), the U.S. Supreme Court
indicated that the term "second or successive" has the same
meaning as it did under the pre-AEDPA judicially crafted
"abuse of the writ" doctrine. Like the other courts of
appeals that have addressed the issue, the Third Circuit
decided in Benchoff v. Colleran, supra, "that a petition that
raises claims that did not exist at the time previous
petitions were filed does not qualify as a "second or
successive" petition under the AEDPA. See James v. Walsh, 308
F.3d 162 (2d Cir. 2002) (claim challenging the incorrect
application of petitioner's credit for time served had not
arisen when petitioner filed his first habeas petition); See
In Re: Taylor, 171 F.3d 185 (4th Cir. 1999) where the court
reviewed pre-AEDPA caselaw and concluded that "under the
doctrine, codified by AEDPA, a claim which did not arise
until a prior petition was filed would not be barred as
'second or successive.'"

   Petitioner argues that whether it be a parole hearing that
produces a constitutional challenge of due process violation
that occurred after the first filing of a habeas petition, or
a post conviction hearing that produces such a constitutional
challenge, both are challenges that raises claims that could
not have been raised in an earlier petition and are not
"second or successive." See In Re: Cabey, 429 F.3d 93 (2005)
where, "State prisoner's petition for habeas corpus relief,
which challenged North Carolina's application of its parole

statutes to him and raised only new issues that did not exist and therefore could not have been raised when he filed initial habeas petition, was not a second or successive habeas petition under Antiterrorism and Effective Death Penalty Act, and thus authorization was not required. 28 U.S.C.A. §2244(b)."

Petitioner did not deliberately withhold this issue of abuse of discretion for federal collateral relief at the time of his first application. Nor was he motivated to withhold his issue from his first habeas petition out of a desire to vex, harass or delay. But rather he was unable to raise this issue in his first federal application because the issue did not exist at the time. See In Re: Bowen, Doc: 2006 WL 146200, [C.A. Mich.] 2006, " ... it is not appropriate to subject Bowen's petition to the restriction attendant to a second or successive petition. Bowen's numerically second petition is not, therefore, "second or successive," and is not subject to the restriction of 28 U.S.C. §2244(b). Also see, Singleton v. Norris, 319 F.3d 1018, (8th Cir. 2003); Esposito v. U.S., 135 F.3d 111 (2d Cir. 1997); Pratt v. U.S., 129 F.3d 54, 60 (1st Cir. 1997); In Sanders v. U.S., 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1948), the Supreme Court explained abuse of the writ: "If a prisoner deliberately withholds one or two grounds for federal collateral relief at the time of filing his first application, in hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground..." "Under the abuse of the writ doctrine, a numerically second petition

is "second" when it raises a claim that could have been raised in the first petition but was not so raised, either due to deliberate abandonment or inexcusable neglect. See McCleskey v. Zant, 499 U.S. 467 (1991).

Contrary to the ruling by the Commonwealth, this claim of abuse of discretion has not been previously litigated in that Court because the Commonwealth refused to accept petitioner's supplemental filing when petitioner's PCRA attorney failed to raise this issue. See (Exhibit E - 4/17/91 letter to attorney - and Exhibit F - petitioner's supplemental brief asking the Appellate Court to recognize this issue).

> PETITIONER'S 1989 PCRA ATTORNEY'S FAILURE TO APPEAL
> HIS ABUSE OF DISCRETION CLAIM WAS CLEARLY AN ACT OF
> INEFFECTIVENESS OR IN THE ALTERNATIVE A LACK OF DUE
> PROCESS AND EQUAL PROTECTION BY THE COURT

Though there is no constitutional right to counsel in habeas proceedings, see Coleman v. Thompson, 501 U.S. 722, 752-3, 111 S.Ct. 2546 (1991), and congress has forbidden relief for ineffective or incompetent representation in post-conviction collateral review. Still, petitioner brings this claim to demonstrate to the Court, that contrary to the ruling of the Commonwealth, this issue was not previously litigated and is not waived. Though petitioner had no right to effective counsel at his post-conviction hearing, he did, under the Pennsylvania Constitution, have a right to a fair and impartial hearing. See Pennsylvania v. Finley, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), Justice Brennan with whom Justice Marshall joins, dissenting. "It has long been settled that even if a right to counsel is not required by Federal Constitution, when a state affords this right, it

must ensure that it is not withdrawn in a manner inconsistent with equal protection and due process. See Evitts v. Lucey, 469 U.S. 387, 400, 105 S.Ct. 830, 838, 83 L.Ed.2d 821 (1985); Ross v. Moffitt, 417 U.S. 600, 621, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961).

Petitioner's PCRA attorney had predicted in a 1988 letter to petitioner that Judge McCrudden would "invent a reason to deny relief." In light of this prediction, and given the fact that the judge used these misstatements to deny petitioner's due process rights, petitioner's PCRA attorney should have been prepared to include the issue of abuse of discretion, bought on by Judge McCrudden's misstatements, in petitioner's appeal. And the Superior Court of Pennsylvania denied equal protection to petitioner when it refused to hear petitioner's claim, raised in petitioner's supplemental brief, after it was determined that petitioner's attorney had not raised the issue as he had agreed to do. See (Exhibit E - 4/17/91 letter to attorney - and Exhibit F - petitioner's supplemental brief asking the Appellate Court to recognize this issue).

The Commonwealth has continuously maintained that this issue has been litigated, but it has not been litigated. The state has erroneously paired the issue of abuse of discretion with petitioner's prior Brady claim of the undisclosed deal and refused to hear petitioner's issue concerning the PCRA Court Judge's misstatements of testimony that supported the Brady issue petitioner raised. Likewise, the Commonwealth has also erroneously paired petitioner's ineffective counsel

64

claim with claims that the PCRA Court had ruled on at the same exact time the court misstated witnesses testimony. So this issue could not have been litigated during the 1989 PCRA hearing because it did not occur until the PCRA Court Judge wrote misstatements into his Order and Opinion. Clearly, the issue of the judge's misstatements and petitioner's prior Brady claim are two separate issues. As is petitioner's claim that the PCRA attorney's failure to raise the issue of the PCRA Judge's misstatements on appeal is a separate issue from the layered ineffectiveness issue raised in petitioner's 1985 PCRA petition, which the Commonwealth should recognized.

In a recent decision by the Pennsylvania Supreme Court, Commonwealth v. Collins, 888 A.2 564 (Pa. 2005), pertinent to petitioner's state raised claim of ineffective assistance of counsel concerning the failure of 1989 PCRA attorney to preserved petitioner's issue on appeal. That Court clarified language from its previous opinions and disapproved of the practice of treating any ineffectiveness claim as if it had no separated constitutional identity. Collins, supra, 888 A.2d at 568-573.

This petitioner's claim concerning PCRA attorney's failure to preserved on appeal the PCRA Court Judge's misstatements of vital testimony that supported petitioner's claims, and the use of those misstatements, (by that same judge), to deny petitioner's claims was never reached on the merits. And as a result, petitioner has been denied due process and equal protection of rights that should have been guaranteed by the Pennsylvania and United States Constitution.

. This issue of the PCRA attorney's failure to preserve the

appeal right of the judge's blatant misstatements of factual and supportive testimony could not have been raised in this petitioner's first habeas petition. For this reason, and in the interest of justice and inherent fairness, this petition should not be considered second or successive under the AEDPA 28 U.S.C. §2244(b), and petitioner's claims, (including the newly discovered evidence) should be reviewed under the pre - AEDPA standards and decided on the merits, whereas, this is not an abuse of the writ situation.

## CONCLUSION

It would be an understatement to point out that this case has had a very long history in the courts. For over 30 years petitioner has been trying to prove his innocence, and most of that time, he did so, as now, pro se. But the mere fact that the history has been so long attest to the due diligence shown by this petitioner. The amount of evidence he presents by way of exhibits, shows the reasonable diligence shown by this petitioner. His first habeas corpus petition was filed only after he contacted the clerk of records trying to locate any existing files on the sole witness for the state. His attorneys and those he hired as investigators searched the archives trying to locate any information about this witness. Petitioner, his attorneys, and the investigators were told no additional files existed. It was not until 2003, when two investigators took a chance and went back to a judge who had been contacted years earlier about this witness, and learned that there were possibly additional files somewhere.

From the very beginning of this case, the prosecutors hid

# EXHIBITS FILED IN HARD COPY