IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN W. GRIFFIN

Petitioner

v.

MIKE WENEROWICZ, ET AL

Respondents

CIVIL ACTION

No. 06-5181

MOTION TO VACATE ORDER DENYING HABEAS CORPUS RELIEF PURSUANT TO FED.R.CIV.PROC.60(b)

Preliminary Statement

1. Six years ago the Court of Appeals for the Third Circuit (E.D. Pa. Civ. No. 06-cv-03953) affirmed a dismissal, on procedural default grounds, of the above reference habeas corpus petition. That pro se petition had raised the claim, et al., Abuse of Discretion, where in 1991 a Post Conviction Hearing Judge's mis-stated in his 1991 Opinion and Order, the testimony of two attorneys who stated that their client had been given a "secret deal" by a prosecutor to testify against Petitioner at his 1975 trial. The PCRA Court Judge then used his mis-stated and reinvented testimony of these witnesses to deny relief to Petitioner and deny him a fair and impartial hearing. Due to Ineffective Assistance of Counsel at this initial review collateral proceedings and the abandonment of and failure to raise the issue of the Judge's mis-statements of witnesses testimony on appeal, Petitioner's claim was in

fact defaulted and never adjudicated. For reasons set forth below, Petitioner now seeks to reopen his prior habeas corpus petition to permit counseled briefing on default, cause and prejudice, and miscarriage of justice.

## Procedural History

2. Petitioner was tried before Philadelphia Court of Common Pleas Judge Jacob Kalish and a jury and convicted of first degree murder and conspiracy. It was alleged that Petitioner and two other men, murdered a fellow inmate while all were confined at Holmesburg Prison. The only evidence at Petitioner's trial was the testimony of a witness who claimed to have seen Petitioner pass his cell walking away from the area where the murder victim's body was found hours later. On August 20, 1977, Judge Kalish sentenced Petitioner to life in prison for first degree murder.

3. Petitioner's direct appeal to the Superior Court was denied. See Commonwealth v. Griffin, 271 Pa. Super. 228, 412 A.2d 897 (1979). Allocatur was denied on April 1, 1980.

4. Petitioner filed a pro se PCHA/PCRA Petition on August 23, 1985. The Commonwealth's Motion to Dismiss was denied by the Honorable Joseph O'Keefe on February 23, 1988. And a full hearing was held before the Honorable James D. McCrudden on January 25, 1989 during which attorney David Rosen, John Scott, and Prosecutor Clifford Haines testified.

5. David Rosen testified that he represented Calvin Hunter (the state's witness against Petitioner) at his sentencing on February 21, 1975. Rosen testified that the DA had told Judge Halbert that the Prosecutor's Office wanted Hunter out of

prison and on probation due Hunter's testimony in the Price murder case. (N.T. 32, 33). Rosen also testified that he had been part of the negotiations with the DA's Office to gain Hunter's release as part of the deal. John Scott testified that he represented Hunter at his guilty plea before Judge Halbert for burglary and receiving stolen goods. Scott also testified Hunter had asked him to call Clifford Haines, the prosecutor in Petitioner's case, about getting out of jail and being given a car and money. Scott told the PCRA court that the DA's Office gave his client money and paid his bills while they housed him in a motel. See PCRA N.T. attached as exhibit A.

6. Prosecutor Haines testified that he entered into no agreements with Hunter at all and there was no deal.

7. On April 3, 1991 Judge McCrudden wrote in his Order and Opinion that:

> Counsel who represented Hunter at his guilty plea before Judge Halbert testified that no one in the District Attorney's office promised Calvin Hunter anything in exchange for his testimony. Counsel who represented Hunter at the sentencing before Judge Halbert stated that he was not aware of any deal and did not participate in any negotiations on Hunter's behalf.......

Attorney David Rosen, after learning of Judge McCrudden's April 3, 1991 Opinion, wrote an affidavit stating that Judge McCrudden mis-stated his testimony. Attorney Rosen wrote that he clearly stated he assisted in negotiations for his client, Calvin Hunter, with the District Attorney's office, in exchange for his testimony in the Griffin case. See attached exhibit B - dated 2006, which was attached to Petitioner's prior 2006 habeas corpus filed with this court.

Reasons For Delay Seeking Rule 60(B)(6) Relief

8. Petitioner has filed numerous habeas corpus petitions, (84-cv-1843 denied on merits; 93-cv-4862 dismissed as abuse of writ, and 06-cv-3953) in an attempt to receive relief from the lack of due process in state court. In the last petitions filed with this court, petitioner attempted to show that he had cause for not previously raising the issues of Hunter's secret deal and undisclosed criminal records. All which is a violation of Brady v. Maryland, 373 U.S. at 87 (1963). This Court denied for a lack of jurisdiction and the Third Circuit Court of Appeals dismissed, stating "Applicant has not shown cause and prejudice or that he is actually innocence."

9. Petitioner avers that in this case, Rule 60(b) is appropriate. In Lasky v. Continental Products Corp., 804 F.2d 250 (3rd. Cir. 1986), the Court detailed the factors the district court should consider in determining whether to grant relief under 60(b)(6):

> [1] the general desirability that a final judgment lightly disturbed; [2] the procedure provided by Rule 60(b) is not a substitute for an appeal; [3] the Rule should be liberally construed for the purpose of doing substantial justice; [4] whether ...the motion is made within a reasonable time; [5] whether there are any intervening equities which make it inequitable to grant relief; [6] any other factor that is relevant to the justice of the order under attack...

804 F.2d at 256 (quoting 7 Moore, Federal Practice at 60.19 (2d.ed 1985). Other relevant factors include whether relief is sought from judgment that has not considered the merits and whether there is merit to the underlying claims. Id 256.

Here, Petitioner's claims could not be raised in this Court due to his inability to raise ineffectiveness of his

Post Conviction attorney's failure to properly raise this issue and show cause and prejudice. Here, the judgment was not considered on the merits. Although the PCRA court ruled on April 13, 2005 that Petitioner's claim that the first PCRA court abused its discretion by "misquoting, misrepresenting" and "fabricating" the testimony of two witnesses, is without merit. That court did not read the record. Had any competent court read the transcripts or Attorney Rosen's affidavit, it would have never stated that the claim is without merit. See Commonwealth v. Widmer, 744 A.2d 751.. "In measuring the trial court's exercise of discretion by an incorrect standard the Superior Court has committed an error of law."

10. Judge McCrudden's Mis-statements and Erroneous quotes of facts in evidence were irreconcilably contradictory to incontrovertible facts testified to by two officers of the court. The fact that Petitioner's attorney was asked by this Petitioner to preserve the record on this precise issue and he failed to, demonstrates the attorney's ineffectiveness and abandonment of Petitioner's issue. See attached exhibit C. When Petitioner discovered that his PCRA attorney had lied about including this claim in his Appellate Brief he tried to raise this claim in Appellate Court, (a Supplemental Brief) himself. See attached exhibit D. However, because he had an attorney of record, that Court never addressed it.

Reason For Seeking Amendment of Order

11. "Procedural default is a doctrine of comity and federalism which sometimes prevents a federal habeas court from ruling on the merits of a claim that has not been

reviewed on the merits by a state court because of the petitioner's violation of a state procedural rule. Not all state procedural rules, however, can prevent merits review by the federal habeas court. To be valid and thus enforceable in federal court, the state court procedural rule must be "adequate" and "independent." See Evans v. Chavis, 546 U.S. 189, 206 (2006). As part of this careful balance a state waiver rule can be "adequate", and bar federal merits review, "only if it is firmly established, readily ascertainable, and regularly followed at the time of the state court's default." Szuchon v. Lehman, 273 F.3d 299, 325 (3d Cir.2001).

12, Petitioner points out that there was no such "firmly established, readily ascertainable and regularly followed" rule at the heart of the Pennsylvania Court's rejection of Petitioner's claim. The Supreme Court of Pennsylvania has recently acknowledged it has inconsistently applied time bars related to failure to file timely appeals. Commonwealth v. Bennett, 930 A.2d 1264; and Commonwealth v. Hollman, No. 08-0093 (Pa.Super. Jan 4, 2008)(unpublished). The Supreme Court's acknowledgment is important because it can not be assumed that the summary denial of an out-of-time petition is not a merits decision. As the 2005 Post Conviction Court in the present case stated in its April 13, 2005 Opinion:

> "Petitioner complaints on appeal are essentially twofold: (1) that this Court erred in dismissing his complaint because the full criminal record of the sole witness for the prosecution, Calvin Hunter, which included crimen falsi convictions, was not disclosed by the Commonwealth in violation of Brady v. Maryland, 373 U.S. 83; 83 S.Ct. 1194 (1963) and (2) that the first post conviction court abused its discretion by 'misquoting and misrepresenting' as well as 'fabricating' the testimony of two witnesses. Neither claim has merits."

The recognition that Pennsylvania courts have routinely "engrafted" merits consideration with timeliness concerns precludes assumption. The Court also acknowledges that it had inconsistently applied the "newly discovered facts" bar in the past, as applied to the discovery of judicial decisions. See Commonwealth v. Chester, 557 Pa. 358, 733 A.2d 1242, 1250 (1999).

13. Petitioner was denied a fair trial and a fair and impartial post conviction hearing. His attorneys, trial and in initial-review collateral proceeding were ineffective for for failing to research and discover hidden criminal records and the undisclosed deal. The post conviction attorney, (even after being asked by this petitioner that he raise the issue), abandoned and failed to raise in Appellate Court, the single most important issue that showed bias and lack of a fair and impartial PCRA Hearing.

14. Martinez v. Ryan, 2012 WL 912950 (U.S.)(No. 10-1001), qualifies Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 115 L. Ed. 2d. 2d 640, by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial. The state collateral review was the first place petitioner could present a challenge to his conviction. He had a right to effective assistance of counsel in assuring that review was fair and impartial.

15. Where state collateral review is the first place a prisoner can present a challenge to his conviction, Coleman, supra, reserved ruling on whether there is an exception to

the rule that: absent a right to counsel in a collateral proceeding, an attorney's errors in the proceeding do not establish cause for a procedural default.

16. Where an attorney during the first collateral review fails to properly argue evidence of ineffective assistance of trial counsel who failed to discover witness criminal records, speak with attorneys who negotiated witness' deal with the prosecutor, such an attorney is ineffective himself. When the attorney failed to include, on appeal, the issue of the PCRA court Judge's misstatements of testimony which supported and proved petitioner's claim, and abandoned this claim, the attorney was ineffective and his ineffectiveness establishes cause for this claim not being adjudicated by the courts.

17. The courts have noted that prosecutors and Judges have a special duty on integrity in their arguments....... It is a fundamental tenet of the law that attorneys may not make material misstatements of fact in summation. Davis v. Zant, 36 F.3d 1538. A cursory review of the 1989 PCRA transcripts of Attorneys Rosen's and Scott's testimony would reveal that the misstatements contained within Judge McCrudden's 1991 Order and Opinion and used as the reason to deny petitioner's claim, constituted plain error that a effective counsel would have pointed out on appeal. Judge McCrudden's misstatements constituted statements of facts not supported by evidence in the hearing transcripts. See Commonwealth v. Irwin, 431 A.2d 257 (Pa. 1981); "It is clearly within the discretion of trial court Judge to summarize for the jury evidence adduced at trial; trial Judge however, **must avoid material misstatements of evidence presented in case.**" And Commonwealth v. Crawford,

305 A.2d 893 (1973); **"A material misstatement involves a variance between the testimony of the witness and the Judge's account of it**....of such a nature as to seriously prejudice the interest of the defendant and deprive him of a fair trial. Also, Commonwealth v. O'Brien, 168 A.2d 244 (1933), which states; "Where the misstatement involves the most important evidence on a crucial legal question or vital evidentiary point in the case, **it may seriously prejudice the defendant's case and is often considered reversible error.**"

18. The testimony of Attorneys Rosen and Scott was clearly important to petitioner's case because they supported, with first-hand knowledge, the argument that Hunter had been given a deal by the prosecutor in exchange for testimony against petitioner. For the Judge to misstate this testimony and then use his misstatements as the sole reason to deny petitioner's claims, constituted error and denied petitioner a fair and impartial hearing. See United States v. Watson, 171 F.3d 695 (D.C. Cir.1999); "It is error for counsel to make a statement in closing arguments unsupported by evidence, to misstate admitted evidence, or to misquote a witness' testimony."

19. Petitioner's initial review counsel had an obligation to direct the Appellate Court to the record showing that the PCRA court Judge had misrepresented the testimony of the two attorneys and witnesses for the petitioner. That Judge had also invented testimony that exist nowhere on the record. But instead, Petitioner's attorney failed to raise this issue after promising Petitioner that he would raise it. And when Petitioner attempted to raise the issue in a Supplemental Brief, the Pennsylvania Court of Appeals never addressed it.

This Court Should Grant The Motion and Reopen Previously Dismissed Habeas Petition to Allow Counseled Briefing on Default, Cause and Prejudice, and Miscarriage of Justice.

Rule 60(b) allows the court, "upon such terms as are to grant relief from a final judgment for: "(6) any other reason justifying relief from the operation of the judgment." Rule 60(b)(6) is a catch all provision which gives the Court "a grand reservoir of equitable power to do justice in a particular case." Radack v. Norwegian American Line Agency, Inc., 318 F.2d 538, 542 (2d Cir. 1963)(quoting 7 moore, Federal Practice at 308(1950 ed.)). Rule 60(b) "is to be given a liberal construction as to do substantial justice and 'to prevent the judgment from becoming a vehicle of injustice.'" MIF Reality v. Rochester Associates, 92 F.3d 752, 755 (8th Cir. 1996)(quoting Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509, 515 (8th Cir. 1984)). The purpose of Rule 60(b) is "to strike a proper balance between the conflicting principles that litigation must be brought to an end and justice be done." Boughner v. Secretary of H.E.W., 572 F.2d 976, 977 (3d Cir. 1978).

In the present case, the delicate balance between finality and justice falls strongly in favor of granting relief. See Martinez-Villareal v. Stewart, 188 S.Ct. 1618, 1622 (1998) - (rejecting proposed application of AEDPA successor bar where petitioner had not received an adjudication of his claim;" proposed rule would have the erroneous result "that a dismissal of a first habeas petition for technical reasons would bar the prisoner from ever obtaining federal habeas review").

Petitioner files this Rule (60)(b) Petition pursuant to, Martinez v. Ryan, 2012 WL 912950 (U.S.)(No. 10-1001) Decided March 20, 2012, which hold "The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law.

Where, as in the present case, a initial-review collateral proceeding is the only proceeding where a prisoner has the chance to present claims he could not raise earlier, federal law requires that the initial-review collateral proceeding be fair and impartial.

Again, Petitioner avers that: Any competent court reading the PCRA Notes of Testimony would see that Judge McCrudden in fact used his own invented evidence and mis-statements of the witnesses testimony to deny Petitioner relief under the Post Conviction Relief Act.

The purpose of the evidentiary hearing was to consider, fairly and impartially, any and all evidence concerning a possible undisclosed deal given to Calvin Hunter, the only witness for the Commonwealth. Both of Hunter's attorneys testified that he (Hunter) had received a deal in exchange for his testimony against petitioner. The record will show there was no other evidence, other than Hunter's testimony that connected petitioner to this crime. Thus, petitioner was prejudices by Judge McCrudden's mis-statement of testimony because the Judge used his mis-statements and mis-quotes to justify a denial of petitioner's claim. The issue affected by this mis-statement was central to petitioner's case and was

not mitigated, either by the Judge who made the mis-statement or by petitioner's attorney, who failed to preserve the issue on appeal.

In a system constitutionally bound to afford defendants due process, this issue of a Judge (purposely) mis-stating testimony and using his mis-statements as the reason to deny petitioner's proven claim, is fundamentally unfair and demonstrates the kind on manifest injustice this Honorable Court should seek to correct. See Dobbs v. Zant, 113 S.Ct. 835, 506 U.S. 357 (U.S. Ga. 1993) "The Supreme Court held that the Court of Appeals should have considered newly discovered sentencing transcripts which called into serious question the factual predicate upon which the District Court and Court of Appeals had relied in denying the claim of ineffective assistance of counsel."

Petitioner is innocence of this crime of murder and had previously tried to present to the court, (unsuccessfully), evidence to that affect. Petitioner has attempted to raise issues of an undisclosed deal and evidence of the undisclosed crime record in prior habeas corpus petitions. But again he was unsuccessful in having his issues heard. Petitioner has continually shown due diligence in his attempts to make the Court aware of the miscarriage of justice in his case.

Due to the Ineffectiveness of PCRA counsel and counsel's Abandonment of Petitioner's Claim, Petitioner was excluded from raising this claim and contrary to what the PCRA Court said in its April 2005, Order and Opinion, petitioner's claim has not been litigated.

Petitioner's current assertions that witnesses testimony

was misstated and misrepresented and used as the sole reason to deny petitioner's Brady claim, is a factually and legally distinct and separate claim from the "Brady issue of after discovered evidence" originally made in earlier proceedings. And do not involve the addition of an ineffectiveness claim to an already-decided substantive claim. See, Corn v. Bell, cited at: WL 1118709 (U.S. 2008)(A ground for relief was previously determined if a court of competent jurisdiction had ruled on the merits of the claim after a full and fair hearing.)

Numerous decisions make clear that a claim is not deemed "litigated" merely because it shares a factual similarity with , or relates to the same evidence at the trial as another claim which has been previously brought. In Com v. Barnes, 248 Pa. Super. 579, 586-587, 375 A.2d 392 (1977), for example, the Superior Court rejected the "previously litigated" contention as to petitioner's claim that his attorney was ineffective for failing to raise lack of representation at a lineup merely because another aspect of the lineup (its suggestibility) had been previously challenged. In Com. v. Hare, 486 Pa. 123, 128, 404 A.2d 388, 390-491 (1979), similarly, the Supreme Court rejected an attempt to equate two different challenges to a guilty plea proceeding, stating, "[a]ppellant' PCRA assertions that the trial court did not conduct a valid colloquy, as required by Pa.R.Crim. 319, and that appellate counsel was ineffective for failing to raise that issue did not merely rephrase his contention on direct appeal that trial counsel, before the colloquy, was ineffective in advising him to plead guilty...

or advance new theories of recovery for same issue." See also Com. v. Morocco, 375 Pa. Super. 367, 544 A.2d 965 (1988) (prejudice prong of ineffectiveness claim based on counsel's reporting "ready" for trial without first determining availability of essential witness, held not finally litigated by earlier claim challenging the court's failure to permit a continuance to obtain that same witness); Com v. Sawyer, 355 Pa.Super. 115, 512 A.2d 1238 (1996) ("A petitioner alleging ineffectiveness of counsel is not barred from seeking relief under the Act merely because he has previously unsuccessfully asserted an ineffectiveness claim, so long as the specific allegation of ineffectiveness has not been previously litigated.")

The Commonwealth's argument that the issue of PCRA Court Judge McCrudden misstatements of evidence has no merit has no support in the record. The Commonwealth's argument that this petitioner has rephrase his Brady issue is equally without support. Petitioner's present issue occurred after he filed his first habeas petition in 1984, and could not have been raised at that time. The Brady issue was the claim he raised at the 1989 PCRA hearing and is a separate issue from Judge McCrudden's misstatements of factual testimony contained in his 1991 written Opinion and used to deny the Brady claim. Petitioner's claim of Abuse of Discretion would have been litigated had petitioner's PCRA attorney not abandoned it and failed to raise it on petitioner's appeal.

REMEDY SOUGHT

This Court's determination whether Petitioner was given a fair and impartial post conviction hearing where the sitting

Judge mis-stated the testimony of witnesses who gave evidence that supported Petitioner's claim of a Brady violation. This Court's determination whether Petitioner's PCRA attorney was ineffective for abandoning and failing to raise the claim of the PCRA court Judge mis-statements and mis-quotes of the witnesses tesimony.

Petitioner request that this Court entertain his habeas petition under the saving Clause in Rule 60(b)(6) of the Federal Rules of Civil Procedural, and maintains that the vacating of judgment by the District Court in his prior habeas corpus petition is warranted and appropriate and represents an extra-oridinary circumstance, moreover the ends of justice would be accomplished by such departure.

Respectfully Submitted,

John Griffin - Pro Se
P.O. Box 244 - AM8535
Graterford, Pa 19426

Date: 11/14/12

CERTIFICATE OF SERVICE

I, hereby certify that I am, this day, serving a true and correct copy of the accompanying document upon the below listed persons and in the below listed manner.

MANNER OF SERVICE:

United States Postal Services

DOCUMENT SERVED:

Motion To Vacate Order Denying Habeas Corpus Relief Pursuant To Fed.R.Civ.Proc. 60(b)

PERSONS SERVED:

The District Attorney's Office
Appeals Unit
Three South Penn Square
P.O. Box 3499
Philadelphia, Pa 19107-3499

John Griffin, Pro Se
P.O. Box 244 - AM8535
Graterford, Pa 19426

Date: 11/14/12

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

- - -

| | | |
|---|---|---|
| COMMONWEALTH | : | FEBRUARY TERM, 1975 |
| | : | |
| vs. | : | |
| | : | |
| JOHN GRIFFIN | : | NO. 1427 |

- - -

POST-CONVICTION HEARING

- - -

February 28, 1989
Courtroom 788, City Hall
Philadelphia, Pennsylvania

- - -

BEFORE: THE HONORABLE JAMES D. McCRUDDEN, J.

- - -

APPEARANCES:

MELISSA KOFSKY, ESQUIRE
Assistant District Attorney
For The Commonwealth

NORRIS E. GELMAN, ESQUIRE
Attorney For The Defendant

- - -

believe that because John Scott either was -- he may have left the office between the time the guilty plea was entered or the sentencing or may have been on vacation or otherwise unavailable, but I know he at one time asked me to handle Mr. Hunter's cases at sentencing which I did.

Q. Did he tell you anything about the cases when you took them over from him?

A. X Yes, he informed me that a deal for a probationary period on the cases had been worked out with the District Attorney's Office in exchange for Mr. Hunter's testimony.

Q. Did he tell you which District Attorney?

A. I know that Mr. Clifford Haines was involved with Calvin and Mr. Scott. I was under the impression that it had been arranged with Mr. Haines.

Q. Scott definitely told you that there was a deal; is that right?

A. Yes.

Q. Okay. Did you have occasion to go in front of Judge Halbert in the middle of February of 1975 on these cases or specifically February 21st?

A. Yes.

Q. Did Judge Halbert know about the arrangements?

MISS KOFSKY: Objection.

THE COURT: I sustain that objection.

Commonwealth wanted him as a witness.

THE WITNESS: Yes.

THE COURT: And you knew the case — you knew something about the case that he was going to testify in; isn't that correct?

THE WITNESS: Yes.

THE COURT: So you didn't have any objections to the deal being made.

THE WITNESS: No.

THE COURT: And you knew the man couldn't be kept in prison or housed in prison under these circumstances; is that correct?

THE WITNESS: Yes, sir.

THE COURT: Did you suggest — did you agree with housing him some place other than prison?

THE WITNESS: Yes.

THE COURT: Nothing wrong with that, was there?

THE WITNESS: No.

THE COURT: Was it a sensible thing to do under the circumstances?

THE WITNESS: Yes.

THE COURT: All right.

BY MR. GELMAN:

THE COURT: What?

MISS KOFSKY: I'm requesting sequestration of the witnesses while Mr. Rosen is on the stand.

MR. SCOTT: No problem, Judge, I love this hallway.

THE COURT: Okay then.

BY MR. GELMAN:

Q. Can you tell us what you know in the way of benefits Hunter got from Mr. Haines or the District Attorney's Office while you represented him?

THE COURT: Well, the District Attorney's Office.

MR. GELMAN: Okay.

THE WITNESS: The deal for probationary sentence in his cases before Judge Halbert and room and board for several weeks at the Holiday Inn.

THE COURT: But this is very important. When was this made? When was the deal made for probation?

THE WITNESS: I do not know — Your Honor, I know that on January the 2nd it's my belief that when the guilty plea was entered they were entered as open guilty pleas.

but he talks in such a way that you can fairly place confidence it's apt to happen? Isn't that correct?

THE WITNESS: Yes.

THE COURT: Now, from your conversations with Cliff Haines or anybody else in the District Attorney's Office can you sit here and say that he or anybody in that office guaranteed or promised him the sentence that Judge Halbert imposed?

THE WITNESS: Yes. Your Honor, my memory is that when I went into before Judge Halbert on that date it was understood the District Attorney in the room and Judge Halbert and everyone that he was.

THE COURT: He had —

THE WITNESS: They were —

THE COURT: He had testified?

THE WITNESS: Yes. Yes, testified.

THE COURT: He testified. All right.

THE WITNESS: And the District Attorney made — told Judge Halbert to give me probation.

THE COURT: He cooperated.

THE WITNESS: Right. Now, afterwards when I became involved with Mr. Haines in

further negotiation, that's when I was the primary representative for Calvin with which I have -- I said at that time -- whatever else Calvin asked for which I have never -- it was nothing ever pinned down.

But I was definitely -- my memory is that it was definite, was represented to Judge Halbert that the District Attorney wanted this man out of prison because of his cooperation.

THE COURT: He already testified at the Preliminary Hearing?

THE WITNESS: Yes.

BY MISS KOFSKY:

Q. You got the file from Mr. Scott sometime after the plea but before Calvin Hunter testified at the Preliminary Hearing; is that right?

A. Yes.

Q. So obviously since the plea had already been taken, did you have the notes of the plea yet?

A. I would doubt very much if we would order plea notes.

Q. Have you had an opportunity to review the notes of the guilty plea notes since then?

A. I saw them yesterday.

Q. And was Mr. Haines at the guilty plea; do you

Q. Okay, and at that time --

THE COURT: Excuse me. Were there three separate trials?

MR. GELMAN: Yes.

BY MISS KOFSKY:

Q. And at that point when Calvin died you knew that a deal had been struck that wasn't on the record, right?

A. No.

Q. Well, isn't it your testimony here today that isn't that the basis of your testimony was that there was a deal?

A. Yes.

Q. And it's not in the record, is it?

A. Well, that's what I'm led to believe.

Q. Well, you have reviewed the notes of the sentencing, right?

A. Okay.

THE COURT: Look, the question to you is -- you're an attorney.

THE WITNESS: Right.

THE COURT: Are you telling me now that there was a deal that's not on the record or there was a deal that's not on record?

THE WITNESS: There was a deal that does not appear on the record.

THE COURT: Does not appear on record.

THE WITNESS: Yes.

BY MISS KOFSKY:

Q. And you also knew that Calvin had testified that no promises had been made to him, right?

A. No, I did not.

Q. You didn't know what your client's Preliminary Hearing Notes of Testimony reflected?

A. No.

Q. And this is a client that you were doing your best to protect?

A. I never read the notes from the Preliminary Hearing that were testified.

Q. Did you ever go to the trial?

A. No.

Q. So as far as you knew there was just this deal that was going to work itself out but Calvin died?

A. What do you mean as far as — as far as I knew I made a deal for my client, I got him out of jail. I did my job.

I don't understand what you're saying.

Q. But no deal is on the record; is that right?

A. Whether there was a record or not he walked out, he got out of prison that day. He was given probation. He got out of prison.

I mean I don't understand whether it's got to be on the record.

THE COURT: Let me ask you this. What would they do with him for this type of a record where he is a druggie?

His biggest problem is drugs; is that correct?

THE WITNESS: Yeah.

THE COURT: He was a druggie.

THE WITNESS: Yeah, and he stole to support his drug habit.

THE COURT: Do you expect the Commonwealth to keep them in jail and be testifying against other prisoners who were accused of murdering another prisoner?

THE WITNESS: Well, I wouldn't expect them to do that but that's why I think they made a deal with him. That's part of the deal.

THE COURT: Is to protect him too.

THE WITNESS: Sure. Well, to protect their witness. I mean to protect him in the sense that he was their witness. They were concerned about protecting him, yes.

THE COURT: But they were afraid he would be killed.

THE WITNESS: Certainly.

THE COURT: So you're not offended by the fact that he was released, are you?

THE WITNESS: No.

THE COURT: All right then.

BY MISS KOFSKY:

Q. When did Mr. Gelman contact you regarding this case?

A. It may have been -- well, it was a year, maybe a year ago, somewhere in there.

Q. And to your knowledge how did Mr. Gelman find out about this deal?

A. I don't recall.

Q. He just called you one day?

A. Well, I mean he knew I was Mr. Hunter's attorney at the sentencing. Yes, he told me. Called me.

He called Mr. Scott too obviously.

Q. Okay. After the sentencing you had to have written a memo to your file about this deal; is that correct?

A. Yes probably.

Q. Okay. You don't recall?

A. Well, when you say a memo I may have just indicated on the file that the sentence was probation in return for his continued cooperation with the

Commonwealth.

However I wrote it up I'm sure I wrote it in or on the file in some manner to indicate what happened.

Q. But as far as you were concerned there was nothing that had gone wrong up to that point, you were get everything that you could for your client?

A. Yes.

Q. And it was only last year that you realized that there was some sort of ethical problem?

A. I believe it wasn't --

THE COURT: Do you find an ethical problem in this case or not?

THE WITNESS: Yes.

THE COURT: What was the ethical problem?

THE WITNESS: If the District Attorney is saying that no deal was made with Calvin Hunter for his testimony, I think that's an ethical problem. And I became aware of that, I said when Mr. Gelman -- I was always under the impression that that would come out at the time of trial, that whatever deal, you know, that had been made.

And it wasn't until Mr. Gelman got in

touch with me and said well, the District Attorney represented there was no deal and I told him well, that's not my memory.

THE COURT: Look, no one knew he was going to be killed, did they?

THE WITNESS: I don't think so. Well —

THE COURT: Weren't they open with Judge Halbert that he was cooperating and had cooperated?

THE WITNESS: Yes, that's on the record.

THE COURT: Weren't they open with Judge Halbert that they didn't want him to be in jail?

THE WITNESS: Yes.

THE COURT: Did you think that Judge Halbert made a right decision?

THE WITNESS: Yes.

THE COURT: You don't think he was misled, do you, by the Commonwealth?

THE WITNESS: No.

BY MISS KOFSKY:

Q. So basically the essence of it was that Judge Halbert was informed that Mr. Hunter was cooperating;

out of town after his testimony.

He wanted to leave town. He did not want to go back to the county prison. He obviously didn't want to do anymore jail time. He didn't want to go to a drug program. He wanted to leave town after his testimony or during the course of his testimony.

As best I recall it, it was more a safety - oriented conversation and it developed into Calvin had a way of being a con man as was his want. I remember one specific conversation where he wanted car from Mr. Haines. To the best of my recollection it was rejected out of hand by Mr. Haines.

He asked for expense or living money. He always had different ideas of how he should be taken care of, and again these may be several meetings. I know there were several conversations with Mr. Hunter and Mr. Haines, with myself and Mr. Haines, and the car idea was rejected.

As best as I can recall within the context of the guilty plea, and I have to put it this way because the guilty plea was clearly entered before any incident happened. Mr. Hunter's record indicated to me at the time that I entered the guilty pleas that although his record may have been lengthy for the most part, they were at least in the early 70's offenses that were

block, they know that I may have had or had opportunity to see things. If I tell you what I saw, I can't sit here. And a drug program is just as bad because they have people in drug programs, and if they want me they can get me.

So, it was in that context that I went to Mr. Haines and there were several discussions, some more serious than others.

Q. What was the bottom line result of your discussions with Cliff Haines?

A. I can only go by the Notes of Testimony on this that I reviewed recently. If you look carefully at the Notes of Testimony — I know that he got out of jail. I know that he was in the Holiday Inn. That he was getting in the Holiday Inn in center city. I know that he did not want to go back to his home because he was fearful to go back to wherever it was that he lived, be it Sartain Street, Secardia or somewhere else. Mr. Haines in his generosity I think may have gotten him a pair of slacks and a sweat shirt.

On the car end of things the one specific thing that I can remember that Mr. Haines and I discussed, Mr. Haines said forget the car, I'll get him a bus ticket. He can go to Greyhound and get on his bus or go to Trailways or whatever and get on a bus.

But in reviewing the notes and looking where Judge Halbert starts for the record at time of sentencing, it's obvious from those notes that there had been a previous discussion.

MISS KOFSKY: Objection. I'd ask to strike that last response, Judge.

THE COURT: No, I'm going to leave it in.

THE WITNESS: All I can say is I read the notes. I know that Judge Halbert in quoting directly from the notes said well, I want to do what's best for you. If you want to be totally out, you will be totally out.

As best I recall it was resolved that he was going to get time into 23 concurrently and all of his cases and programs in additional probation. That he wanted to leave town and that it was going to be accommodated, that if he was going to leave town, then fine, he could leave town or just not be constrained by additional drug programs and/or reporting probation.

It was never to the best of my recollection specifically written down but it also has to come into hey, that at the time that

THE WITNESS: Well, there indicates Mr. Dickstein was involved from -- formerly Steven Dickstein who was formerly an Assistant Defender.

See, this was at this particular time again where I was preparing to leave the office. I do remember, and I cannot remember the setting to how Mr. Hunter -- I know I had discussions with him about the incident. I know I had preliminary discussions such as they were further to call them preliminary with Mr. Haines. I can remember going into the old 666.

BY MR. GELMAN:

Q. Mr. Scott, did you communicate to Mr. Haines Mr. Hunter's desires about what he wanted in exchange for his testimony?

A. He wanted no restraints per se.

Q. Did you tell that to Cliff Haines?

A. Yes, that clearly and so did Mr. Hunter.

Q. What did Haines tell you?

MISS KOFSKY: Objection.

THE COURT: I'll allow it. Haines wanted him as a witness.

THE WITNESS: No question.

THE COURT: After Haines learned about

he got out because he was in the Holiday Inn and the District Attorney's detectives, whose name I can't remember, had taken him over there and registered him for a couple of week period, had made sure, and he was not getting money in advance, so that comes back to me.

They were going over paying him money or opening accounts so that he couldn't go and take off with a whole bunch of money, they were paying him for daily meals. The car as I said, was rejected but I just remember a conversation about we will get you a bus ticket and if he wants to leave town, we will go over and he can go get over to the bus and we will pay for the bus ticket.

I don't think there was any strenuous objection if my bottom line recollection is right, to his not having to go to an inpatient drug program. It was going to be then that's when the non-reporting probation came into play.

THE COURT: But I gather from the way you're testifying that he indicated or said he was frightened to go to a drug program.

Is that correct?

THE WITNESS: Oh, he was clearly -- he

had wanted to have no parts of any type of confinement under supervision with other people were present that might be able to harm him at the behest of another. He didn't want to have anything to do with the prison and he didn't want to have anything to do with an inpatient drug program.

BY MR. GELMAN:

Q. Is it fair to say that you really just don't have a recollection of what transpired?

MISS KOFSKY: Objection.

THE COURT: No, I'll allow him to --

THE WITNESS: I have very little vivid recollection other than these vignettes that I have thrown out that I can remember having a few discussions. I would suggest not more than maybe three or four with Mr. Haines.

I don't have a great -- I have a perfectly vivid independent recollection of Mr. Hunter as I have known him over a period of two years.

BY MR. GELMAN:

Q. You do recollect that Hunter had demands; is that correct?

A. Yes.

Q. Okay. Do you recollect or do you not remember what Cliff Haines' response was to Hunter's demands whether Hunter made them himself or you made them?

MISS KOFSKY: Objection.

Judge, we have gone over this already.

THE COURT: I know he has but I think — I don't think he is anybody's witness. He is going to tell us what he knows and he doesn't care.

Do you understand the question?

THE WITNESS: Yes, I do.

THE COURT: Go ahead.

THE WITNESS: I know he rejected the one out of hand.

BY MR. GELMAN:

Q. Which is the one?

A. Which was the car. He wanted a Volkswagen, he wanted a Bug or a Beetle.

Q. How about the four cases that he pled guilty to, no jail, no probation, no drug program, no nothing?

A. I think that there was — and this is the best of my recollection — that there was room for negotiation there. That it became apparent that he had pled to minor quote unquote offenses, was going to receive a short county time which he had basically come close to

or the cases we got them all consolidated and there had been a prior understanding before even the homicide occurred.

Your Honor understanding between the Prosecutor's office, whoever may be their representative at the time and the Judge it was not uncustomary for the Judge to sit down in the interest of the expedition of justice to see what have we got, can we get rid of all these in a block, something similar to that. It may have occurred before.

The time of the sentence I would say going only on experience at the time and experience in that courtroom and in reflecting back, it could have very well — I could have very well easily entered this plea as not without the other circumstances for same or similar results.

Q. Now you testified that you recalled having some conversations with Mr. Haines about Calvin Hunter's situation?

A. Clearly.

Q. Do you recall ever — do you recall ever negotiating for a period of probation for Calvin in exchange for his cooperation?

A. All I can suggest to you is there may have been discussions pertaining to the fact that he had pled or he

was going to plead and the reasonable sentence was such and such, but he could not be fettered.

All I can specifically remember is he did not want to have additional county prison time or an inpatient -- that's what I more specifically remember. I mean there were several talks back and forth as to an inpatient drug program where someone could do him some harm.

Q. Okay. Now, do you recall when you left the Defender's Office?

A. Early 1975. I can go pull the rest of these files which I didn't do but it was at or about this time.

Q. And do you recall assigning these cases to Mr. Rosen?

A. No. I may have talked to Mr. Rosen. Mr. Kelly was the chief back then for all of the trial unit and would have done the assigning or the reassignments of my particular workload.

Q. Okay. Do you recall -- so as far as you were concerned with these cases Calvin Hunter pled guilty, he had already served time and that was the end of it.

Is that accurate?

A. Up to a point that's accurate, but there's also our discussions had with the Commonwealth, with the Prosecutor, Mr. Haines, and I don't recall if I had

discussions with others. I'm sure I had discussions with the trial system in the courtroom which led to Mr. Haines.

So, it wasn't just I pled and you can't take that in a vacuum. I know these other facts were going on and I for that reason specifically had discussions with Mr. Haines that we had to get Mr. Hunter. And I don't know if it so much pertained to these cases but also to his well-being. It was all right we have got these matters.

We clearly can't have reporting probation. He wanted to leave town. He tried on several occasions to get money. No different than Sidewalk Sam out here. He was always asking Mr. Haines or myself or someone in the Defenders for money. He wanted a car, couldn't get the car, but he was very adamant that the fact that he needed total freedom.

Q. Okay. So you obviously had a relationship with Mr. Hunter. Is that accurate?

A. As his attorney, yes.

Q. And you testified that you had known him previously; is that right?

A. I had represented him several times over the course of the preceding two or three years.

Q. X Okay, and you had these discussions with Mr.

know that Calvin Hunter was cooperating with the Commonwealth, right?

A. Well, clearly not. And I'm almost sure, I am almost sure and I suggested to you before and you objected and if I may, if you read the Notes of Testimony, it's clear from any — no matter how you interpret the spoken words of Judge Halbert at the time of sentencing, that he was fully aware of certain things involving Mr. Hunter's cooperation in a serious matter.

THE COURT: He was told.

THE WITNESS: He obviously had to be although it's not on the record in the notes.

BY MISS KOFSKY:

Q. And as far as you were concerned at this time Mr. Haines had done nothing wrong in his handling of Calvin Hunter?

A. No one — I don't know that it's been suggested that even today, up to today that he did anything wrong. There were discussions as were routine as would happen today in the same set of facts.

Q. Okay, but aren't you here today because you believe there was some ethical violation now?

A. No. I'm here because I was —

THE COURT: He was here because Mr. Gelman asked him to be here.

A. At some point in time I'm sure that I was aware of that fact, yes, but I don't recall when.

Q. Okay. Do you have any recollection of speaking to Judge Halbert about Calvin Hunter?

A. Yes, I have a recollection.

Q. Okay. Do you recall what you said?

A. I never spoke to Judge Halbert about Calvin Hunter.

Q. Okay. Do you recall --

A. I never had a serious conversation with Judge Halbert about anything ever.

Q. Do you recall --

A. To this date.

THE COURT: I'm not sure how to interpret the word 'serious'.

In other words, do I understand that your conversations with him were more social and --

THE WITNESS: That's an appropriate way to put it, Your Honor, yes.

But no, the answer to your question is no, I never discussed this case with Judge Halbert.

BY MISS KOFSKY:

Q. Okay. Now, do you recall every having any

Commonwealth of Pennsylvania :

ss

County of Philadelphia :

I, David C. Rosen, Esquire hereby state that I am an attorney for the Public Defender's Association and that the following facts are true and correct to the best of my information, knowledge and belief, and acknowledge that my statement is subject to the penalties of 18 Pa.C.S. §4904, elating to unsworn falsification to authorities.

On December 2, 1985, I wrote to the defendant, John Griffin, advising him of the agreement between Calvin Hunter's attorneys and Clifford Haines, Esquire, then Chief of the District Attorney's Homicide Unit. A copy of that correspondence is attached hereto and marked as Exhibit "A".

On May 7, 1987, I executed an Affidavit in the Commonwealth v. John Griffin, February Term, 1975, os,. 1427 - 1432 matter which at the time was before the court for consideration of the defendant's petition for relief under the Post Conviction Hearing Act. 42 Pa. C.S.A. 9541 et seq. A true and correct copy of that Affidavit is attached hereto and marked as Exhibit "B".

On February 28, 1989, I appeared at an evidentiary hearing in the Griffin case, before The Honorable James D. McCrudden and gave testimony. A true and correct copy of the pertinent pages of my testimony are attached hereto and marked as Exhibit "C".

On April 3rd, 1991, The Honorable Judge James D. McCrudden's entered an Opinion denying the defendant's petition for relief under the Post Conviction Hearing

Act. A true and correct copy of this Opinion is attached hereto and marked as Exhibit "D".

On page 4 of this Opinion, Judge McCrudden mis-stated my testimony when he wrote:

> .. Counsel who represented Hunter at his guilty plea before Judge Halbert testified that no one in the District Attorney's Office promised Calvin Hunter anything in exchange for Hunter's testimony. Counsel who represented Hunter at the sentencing before Judge Halbert stated that he was not aware of any "deal" and did not participate in any negotiations on Hunter's behalf or between Hunter and the District Attorney's Office. We find this testimony to be entirely credible.

A review of my testimony at the Post Conviction Hearing, attached hereto, clearly states that I assisted in negotiations for my client, Calvin Hunter, with the district attorney's office, in exchange for his testimony in the Griffin case, before The Honorable Marvin L. Halbert.

The agreement made was that Mr. Hunter would plead guilty on his several open burglary cases, receive a 46 month probation, the first 23 of which would be non-reporting probation, and testify as a Commonwealth witness in the prosecution of John Griffin for the murder of James Price.

David C. Rosen

DAVID C. ROSEN, ESQUIRE

Sworn to and Subscribed
Before me this 12 day
of March A.D. 2004

Christine M Adler

Notary Public

My Commission Expires:
April 29, 2006

NOTARIAL SEAL
CHRISTINE M. ADLER, Notary Public
City of Philadelphia, Phila. County
My Commission Expires April 29, 2006

John Griffin
No. 00311-159
Karnes "B"
F.C.I. - P.O. Box 4200
Three Rivers, Texas 78071-4200

April 17, 1991

Norris Gelman, Esquire
Suite 750
The Curtis Center
625 Walnut Street
Philadelphia, Pennsylvania 19102

Re: Commonwealth v. Griffin

Dear Norris:

It is my hope that you are in the very best of health and high spirits. As for myself, I am well and trying to remain so.

I enjoyed our conversation last week, and appreciate not only your honesty and understanding, but your consideration and commitment as well.

Today I received a copy of the Judge's decision. It seems that he just adopted the arguments of the prosecutor and signed his name to it.

It is very clear to me that there is a need to point out Scott's actual testimony. Although he says the word "deal" or "promise" wasn't used, it is obvious. He makes it plain that someone had spoken to Judge Halbert about what they wanted for Calvin Hunter.

Judge McCrudden states that we should have called Judge Halbert to the stand. Judge Halbert's record did speak from that stand and the appeal brief should leave nothing to the imagination.

I know you believe in the malice issue and I hope you will explore and expound on it; however, my strongest issue remains the issue of the "deal" and I would like for it to be made clear to the Court that both Scott and Rosen's testimony supports this issue. The record does not support Clifford Haines or Michael Henry's testimony.

Please get back to me on this Norris. I feel it's an important issue and every effort should be made to establish the record correctly.

Sincerely,

John Griffin

4-16-91
P. 318

Superior Ct # 1178 Phila 1991

RECEIVED
JUL 15 1991
CLERK OF QUARTER SESSIONS

IN THE SUPERIOR COURT OF PENNSYLVANIA
PHILADELPHIA DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | PHILADELPHIA TERM, 1991 |
| V. | : | NO. 1178 |
| JOHN GRIFFIN (APPELLANT) | : | ATTY ID #14223 |
| | | CP# 75-02-1427 |

SUPPLEMENT BRIEF FOR THE APPELLANT

PETITION TO AMEND OR SUPPLEMENT BREIF FROM THE DENIAL OF POST CONVICTION RELIEF ACT BY THE HONORABLE JUDGE JAMES D. McCRUDDEN OF THE PHILADELPHIA COURT OF COMMON PLEAS, CRIMINAL DIVISION TRIAL SECTION AS OF NOS. 1431 AND 1432, OF THE JANUARY TERM OF 1975, OF THE FORESAID COURT. SAID RELIEF HAVING BEEN DENIED PER OPINION AND ORDER OF APRIL 3RD, 1991.

TO THE HONARABLE COURT:

The petition of John Griffin, Petitioner, move to Supplement or amend the Appeal from the Denial of Post Conviction Relief Act filed in his behave under 42 Pa. C.S.A 9541 et seg. pursuant to 9547 by this plead for the following reasons.

This defendant being incarcerated in the United States Federal Correctional Institution at Three Rivers Texas, and not having viewed the brief filed by his Attorney Norris Gelman, until after the filing date, would beg this Honorable Court to allow him to file this arguement as a supplement or Amendment to said brief. This petition is in no way a indication of disatisfaction with petitioner s Attorney of record. Defendant is merely attempting to preserve and protect the record, and his entire arguement, while providing the court with a clear and pr[illegible] case.

RECORD FILED IN SUPERIOR COURT
AUG 06 1991

Supplemental Brief Filed





ARGUEMENT

The defendant states that the Honorable Judge McCrudden was in error by ruling that Defendant's claims are not supported by the record.

Calvin Hunter's sentencing trancript (2/21/75) supports the claim of a deal in this case. The Post Convictiion Hearing transcript before Judge McCrudden (1/25/89) also supports defendant's claim.

In his Opinion and Order dated 4/3/91 Judge McCrudden correctly states that Calvin Hunter was a witness against the Defendant and testified that no deals had been struck between himself and the Commonwealth. What Judge McCrudden failed to state was that counsel who represented Calvin Hunter in 1974, Attorney John Scott, testified at the Defendant's Post Conviction Hearing that he had discussions with the Commonwealth concerning Calvin Hunter's demands before Mr. Hunter testified at Defendant's Preliminary Hearing. Mr. Scott states for the record that he was not involved in this case at the time of Defendant's Hearing. Therefore, these discussions had to have taken place prior to February 13, 1975, the date of the Defendant's Preliminary Hearing.

Attorney Scott also testified that these "discussions" were between himself and Mr. Clifford Haines of the District Attorney's office and that he informed Mr. Haines that his client, Calvin Hunter, was adamant that he receive total freedom. PCHA transcript (1/25/89) Scott, pg. 86.

In fact, that testimony of Attorney Scott shows, without a doubt that some agreement existed. When asked on direct examination what Clifford Haines response was to Attorney Scott regarding Calvin Hunter's demands, Attorney Scott states that the car was rejected but to the best of his recollection, there was room for negotiation on the demands for no jail, no probation, no drug program. PCHA Transcript (1/25/89) Scott, pg. 76. Discussions clearly took place before Calvin Hunter testified at defendant's Preliminary Hearing of 2/13/75 and the results of those discussions were exactly what Calvin Hunter's attorney said were the demands of his client.

At defendant's Post Conviction Hearing, testimony was given to show that Judge Halbert, the sentencing Judge for Calvin Hunter, was indeed made aware of Calvin Hunter's cooperation. PCHA Transcript (1/25/89) Scott, pg. 90 and PCHA Transcript (1/25/89) Rosen pg. 47. Although Judge McCrudden states in his Opinion and Order that Calvin Hunter's counsel at sentencing before Judge Halbert was not aware of any deals. The counsel that represented Calvin Hunter at his sentencing was Attorney David Rosen, the same witness who testified that Attorney Michael Henry of the District Attorney's office and himself made Judge Halbert aware that the District Attorney's office position was that they were recommending probation for Calvin Hunter's cooperation with the Commonwealth as a witness against the defendant. PCHA Transcript (1/25/89) Rosen pg. 47. Mr. Rosen also stated there was a deal that does not appear on the record, and when asked by Judge McCrudden if there was an ethical problem, Mr. Rosen stated if the District Attorney's office is saying that no deal was made with Calvin Hunter for his testimony, I think that is an ethical problem. PCHA Transcript, Rosen pg. 52.

IN THE SUPERIOR COURT OF PENNSYLVANIA
PHILADELPHIA DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | PHILADELPHIA TERM, 1991 |
| v. | : | NO 1178 |
| JOHN GRIFFIN (APPELLANT) | : | ATTY ID # 14223 |

CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby states that he has served copies of this supplement by way of mail to the addressee below:

Norris E. Gelman, Esquire
Suite 750
The Curtis Center
625 Walnut Street
Philadelphia, PA 19106

Melissa Kotsky, Esquire
Assistant District Attorney
for the Commonwealth.
The District Attorney's office
City Hall,
Philadelphia, PA 19106

Respectfully Submitted,

John Griffin
#00311-158
Karnes B.
F.C.I.
Three Rivers, Tx 78071